[Cite as *State v. Sayre*, 2013-Ohio-4108.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO. 9-12-25

    v.

HAROLD SAYRE,                            O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 11-CR-084

Judgment Affirmed

Date of Decision: September 23, 2013

APPEARANCES:

    *Robert C. Nemo* for Appellant

    *Brent W. Yager and David J. Stamolis* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Harold Sayre ("Sayre") brings this appeal from the judgment of the Court of Common Pleas of Marion County finding him guilty of aggravated vehicular homicide and operating a vehicle while under the influence. For the reasons set forth below, the judgment is affirmed.

{¶2} On November 11, 2010, Sayre spent the day with his friend Jennifer McClure ("McClure"). At the end of the day, Sayre was taking McClure home on his motorcycle. Sayre lost control of the motorcycle and McClure was thrown from the motorcycle. When the paramedics arrived, Sayre was transported to the hospital by ambulance and eventually transported by helicopter to a hospital in Columbus for severe injuries. McClure unfortunately was pronounced dead at the scene. Sayre's blood was tested at the hospital seven hours later and the blood alcohol content was determined to be .064 at that time.

{¶3} On February 17, 2011, the Marion County Grand Jury indicted Sayre with one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a), a felony of the second degree, and one count of operating a vehicle under the influence in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree. A jury trial was held from February 13 until February 16, 2012. The jury returned a verdict of guilty on both counts. On March 20, 2012, a sentencing hearing was held. The trial court sentenced Sayre to seven years in

prison for the aggravated vehicular homicide and three days in jail for operating a vehicle under the influence. The sentences were ordered to be served concurrently. Sayre appeals from this judgment and raises the following assignments of error.

### First Assignment of Error

**The verdicts against [Sayre] were against the manifest weight of the evidence.**

### Second Assignment of Error

**The trial court committed numerous evidentiary errors to the prejudice of [Sayre] and failed to instruct the jury on independent [intervening] cause of death.**

### Third Assignment of Error

**[Sayre] was denied his constitutional right to a fair trial as a result of the trial court stating that [Sayre] was not answering questions and that [the State] would not get an answer from Appellant.**

### Fourth Assignment of Error

**[Sayre] was denied his right to effective assistance of counsel as a result of his counsel's failure to object to numerous evidentiary matters.**

The assignments of error will be addressed out of order in the interest of clarity.

{¶4} In the second assignment of error, Sayre claims that the trial court committed numerous evidentiary errors and failed to instruct the jury on independent, intervening causes of death. This assignment of error is based on

Case No. 9-12-25

four different alleged errors. The first alleged error is that the trial court allowed a witness to testify to the cause of the accident without a proper foundation. Evidence Rules 701 and 702 govern the use of opinion testimony.

> **If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.**

Evid.R. 701.

> **A witness may testify as an expert if all of the following apply:**
>
> **(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;**
>
> **(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;**
>
> **(C) The witness' testimony is based on reliable scientific, technical or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:**
>
> **(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;**
>
> **(2) The design of the procedure, test, or experiment reliably implements the theory;**
>
> **(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.**

Evid.R. 702. This court has previously addressed the issue as to whether an officer who was not present at the accident and is not an expert witness can testify as to the cause of the accident and determined that the answer to that question is no. *Petti v. Perna*, 86 Ohio App.3d 508 (3d Dist. 1993). In *Petti*, this court held that in order for an officer to offer an opinion as a lay witness, the officer must meet the requirements of Evidence Rule 701. This means that the officer must be basing the testimony on his or her own perceptions. *Id*. at 513. To testify as an expert witness, the officer's qualification to testify as an expert must be present on the record. *Id*. Without meeting the requirements of Evidence Rules 701 or 702, an officer may not offer opinion testimony as to the cause of the accident. *Id*.

{¶5} In this case Ohio State Trooper David G. Shockey ("Shockey") testified for the state. Shockey testified that he had received specialized training in crash investigation. Tr. 245. Shockey went to the scene the day after the accident to take daytime photos. Tr. 247. At the scene, Shockey observed a rut in the yard that ran in a straight line from the road to the fence line. Tr. 249. Shockey testified that he saw no indication at the scene that the motorcycle had traveled in any manner other than a straight line. Tr. 252. On cross-examination, Shockey admitted that he was not involved in the investigation in any manner other than taking the photographs and examining the tires of the motorcycle. Tr. 257. He also stated that he did not act as an accident reconstructionist on this case. Tr.

266. According to Shockey, nothing that he did contributed to determining the cause of the accident. Tr. 268. However, on redirect examination, Shockey testified as follows.

> **Q. Based on what you saw when you investigated the scene, your review of the report, is it clear that the person just – the driver, the Defendant, he just missed that curve and drove straight off the road?**
>
> **Mr. Coulter: Objection in all due respect. He said he was not able to determine the cause of the accident now they're having him testify –**
>
> **The Court: Overruled. He can answer.**
>
> **Q. So he just drove straight off the road, is that correct?**
>
> **A. From what I observed at the scene following the crash that's what my impression was.**
>
> **\* \* \***
>
> **Q. [On recross-examination] You can't say what caused him to go straight off the road, can you sir?**
>
> **A. No, I cannot.**

Tr. 269-270. Although the original question indicated that the Defendant "just missed that curve and drove straight off the road", the question to which Shockey provided an answer was whether the motorcycle went straight off the road. Shockey indicated that based on the ruts from the tire at the scene, that is what happened. On recross-examination, Shockey testified that he could not determine why the motorcycle went straight off the road. Thus, Shockey did not testify as to

the cause of the accident. Instead, he only testified to what he determined from his own observations, which is in compliance with Evidence Rule 701.

{¶6} In addition, Sayre claims that the trial court erred by permitting a second witness, paramedic Matt Kokos ("Kokos") to testify as an expert without laying a foundation for his qualifications as an expert. Kokos testified as follows.

**Q. Was the Defendant showing any signs of pain at that time?**

**A. Not severe pain. I mean when I touched it he did grimace, but he didn't yell out in pain.**

**Q. Would you expect somebody with that injury to show more signs of pain?**

**A. Yes.**

**Mr. Coulter: Objection, speculation.**

**The Court: Overruled.**

**Q. Thank you. Did that strike you as strange or unusual in any way?**

**A. Given the situation, the odor of alcohol, most patients don't have as high of a pain – they don't notice pain as well when they've been drinking. It's just –**

**Mr. Coulter: Objection. I don't know if he's qualified –**

**The Court: I don't know if he's qualified for that. Let's get off of that.**

Tr. 207-208. There is no question that the ideal procedure upon sustaining an objection on a question which has already been answered would be to strike the

answer and/or instruct the jury to disregard the answer. That was not done in this case. At no time was the jury specifically told to disregard all answers to which an objection was sustained.[1] However, Sayre did not request such an instruction. Additionally, Sayre does not point to how the alleged error was prejudicial. On cross-examination Kokos admitted that all of the symptoms he attributed to alcohol consumption could have been caused by shock due to what had occurred. Tr. 213. Without some evidence of prejudice, any error would be harmless.

{¶7} Sayre also objected to the testimony of paramedic Rocky Booth ("Booth"). Booth testified as follows.

> **Q. Did the Defendant seem to be in very much pain with this injury [the broken femur].**
>
> **Mr. Coulter: Objection, speculation.**
>
> **The Court: I'll let him answer if he can.**
>
> **A. Not as much as I would have suspected.**
>
> **Q. Did you smell any alcohol on him?**
>
> **A. Yes.**
>
> **Q. Was there anything that you observed to make you think that he may be under the influence of alcohol or drugs?**
>
> **A. Yes.**

---

[1] The jury instructions simply instructed the jury to disregard all statements which had been stricken by the trial court and those that the trial court specifically told the jury to disregard. The trial court also told them not to speculate as to an answer not yet given when an objection was sustained. However, the trial court did not instruct the jury to disregard any response given to a question when the objection was sustained.

**Q.   Can you recall what that was?**

**A.   Just the fact that his pain wasn't as great as it typically would present –**

**Mr. Coulter:  Again objection, speculation.**

**The Court:  Overruled.  Go ahead.**

**A.   That's one of the more painful bones to break in the body. And they're quite painful.  Usually the only type of relief we can give someone is to put them in a traction splint and pull the muscles apart which usually spasm that causes the pain.  He referred to some pain in the leg, but it wasn't that much of a concern.  And there was – there was the odor of alcohol.**

Tr. 230.  Although this testimony may have been partially subjective in its answer, Booth was testifying that based upon what he observed, Sayre did not appear to be in much pain.  He then went further to testify that he smelled alcohol on Sayre and made the connection that the ingestion of alcohol was lessening Sayre's pain.  All of this was based upon his independent observations, which is permitted pursuant to Evidence Rule 701.

{¶8} Sayre also objected to the testimony of Ohio State Trooper Aaron Williams ("Williams").  Williams testified as follows.

**A.   When I first made contact I was within – like a foot of him – two feet of him and there was some – the medical personnel was also standing around him.  The subject – there was a very strong odor of an alcoholic beverage coming from his person, his eyes were red, bloodshot, and glassy; his speech was slurred, and one thing that was noticed, he wanted a cigarette, and with my experience what I've noticed is if I just make a traffic stop working midnight shift and I walk up to a car usually from later**

on if you kind of look back over that whole stop, if that person lights up a cigarette I can say from experience most of the time that person is under the influence of something.

Mr. Coulter: Objection, that's speculation. There's no foundation.

The Court: Overruled. Continue.

Q. Go ahead.

A. Is the reason that people want to light a cigarette immediately when they are impaired is they're trying to disguise the odor of whatever it is that they were under the influence of. So –

Mr. Coulter: Objection for the record. Again he's speculating, for the record, my objection.

The Court: Overruled. Continue.

A. Is when someone is – when I stop someone on midnight shift and I see a freshly lit cigarette from my experience the majority of the time I'm going to be smelling the odor of alcohol later and we'll go from that point on to see if they're impaired or not, but the lighting of a cigarette immediately is usually to mask the odor from my experience.

* * *

Q. Did he appear lethargic to you?

A. The way he was holding his cigarette in his hand, it was like his – he's just very limp, I guess if you're holding a cigarette, I mean I don't smoke, but I see people, and if you're holding anything, a pen and you're writing, you have some form of firmness to yourself, you know, just normal, like you're not just sitting there like limp. Like I can remember the cigarette was between his fingers and it's just loosely hanging there and his wrist is just limply – you know, he's got his elbow down resting

-10-

> **on his elbow, and he's just holding it. Very limp like. If you're gonna smoke a cigarette you're gonna be a little more firm in your – just normal.**

Tr. 404-06. Sayre claims that Williams was testifying as to his opinion. However, the trial court determined that Williams was testifying to what he observed and to what he has learned from his experience. This is not the same as testifying to his opinion. As a lay witness, Williams is permitted to testify to his own observations and what he learned from them. Thus, this testimony does not violate Evidence Rule 701.

{¶9} The second issue raised by Sayre is that the trial court did not allow him to explore the psychiatric status of one of the witnesses. On direct examination Amanda Clark ("Clark") testified that she observed the motorcycle just prior to the accident and then soon after it left the road. Tr. 355-57. On cross-examination, the witness stated that before giving the statement to the police, she spoke with her mother, her husband, and her psychiatrist. Tr. 360. Clark testified that she was under psychiatric care at the time of the accident. Tr. 361. However, when defense counsel asked the witness if she was still under psychiatric care, the trial court ordered the defense to move on. Tr. 361. Sayre claims that he should have been allowed to inquire into the psychiatric issues more pursuant to Evidence Rule 616(B).

{¶10} Evidence Rule 616(B) provides that a witness may be impeached by showing a "defect of capacity, ability, or opportunity to observe, remember, or relate" information. Evid.R. 616(B). "In appropriate cases psychiatric testimony can be used to impeach a witness whose ability to perceive, remember, or relate events is allegedly impaired by organic illness or a psychiatric disorder." *State v. Wilson*, 8 Ohio App.3d 216, 220 (8th Dist. 1982). The trial court has broad discretion as to the admission or exclusion of evidence. *Columbus v. Taylor*, 39 Ohio St.3d 162 (1988).

{¶11} Initially, this court notes that the question to which the State objected and the trial court sustained was whether Clark was under psychiatric care at the time of the trial. Counsel for Sayre did not argue the relevance of the issue to the trial court. Sayre was allowed to set forth that at the time of the incident, Clark was under psychiatric care. Sayre did not ask any questions which would clarify the reasons for the care or provide any basis to show that the continued care affected the ability of the witness to provide testimony. There was no proffer that would indicate how being under a psychiatrist's care affected the witness' ability to observe and testify to what she observed. Without some showing of prejudice, this court has no basis upon which to find that the trial court abused its discretion.

{¶12} The third issue raised by Sayre is the testimony given by Harry Plotnick ("Plotnick") as to the blood alcohol level at the time of the accident.

Sayre claims that the testimony was not given based upon an opinion to a reasonable degree of scientific certainty. "Generally, 'an expert opinion is competent only if it is held to a reasonable degree of scientific certainty.'" *State v. Elam*, 3d Dist. Hancock No. 5-02-57, 2003-Ohio-1577, ¶ 7 (quoting *State v. Benner*, 40 Ohio St.3d 301 (1988), abrogated on other grounds by *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112). However, experts in criminal cases may testify in terms of possibilities rather than in terms of reasonable degree of scientific certainty or probabilities. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶77. Once the jury understands the possibilities, it can then assign the weight to be given to the evidence. *Id*.

{¶13} A review of the record in this case indicates that at no time did Plotnick testify to a reasonable degree of scientific certainty. In addition, Plotnick did not testify in terms of possibility. Instead he testified that this was the result using generally accepted scientific principles to do the calculations.

**Q. You started off with a .064, is that correct?**

**A. Yes, the headspace alcohol analysis test done by the Ohio State Highway Patrol Laboratory indicated that, and I believe it was 5:21 in the morning, that the blood alcohol level was .064 grams per 100 milliliters of blood.**

**Q. If you base that and take it with the last time the Defendant had a drink at approximately 9:30 based on his own report, the fact that he had a strong odor of alcohol, red glassy eyes, that he was a driver of a motorcycle which went left of center off a**

**roadway, are you able to make any type of determination based on those things along with the 064?**

**A.   Well, you're talking about –**

**Q.   As far as an extrapolation goes?**

**A.   Yeah, I can – I can extrapolate and at least give you a – what I believe to be a minimum blood alcohol level at the time of the collision or the accident.**

**Q.   And based on those criteria did you do that in this particular case?**

**A.   I did.**

**Q.  What was your result?**

**A.   Mr. Coulter:  Objection for the record.**

**The Court:  Noted.  Go ahead.**

**A.   Based upon generally accepted scientific principles with respect to the disappearance of alcohol from the bloodstream I concluded that the blood alcohol level at the time of this collision about 9:30 (sic), that the blood alcohol level was not less than a .16 grams per 100 milliliters of blood.**

**\* \* \***

**Q.   Going back to the gas chromatograph, the headspace test the State Highway Patrol uses, is that an accurate test?**

**A.   I can't speak to this particular test on this particular individual, but I am familiar with the way that the State Highway Patrol Laboratory performs alcohol analysis using an alcohol headspace method and a gas chromatographic method, and it's my belief that it is the most reliable method for testing blood alcohol that's used in the United States today.**

-14-

Tr. 510-11, 513.  Upon cross-examination, Plotnick stated that all of his testimony was based upon the presumption that the original figure of .064 was correct.  Tr. 525.  Throughout his testimony Plotnick repeatedly stated that his calculations were correct regardless of any factors.  Thus, although he did not testify directly to the degree of certainty, the jury could infer from the testimony Plotnick gave that he was very certain of his results.  This satisfies the requirement of the Ohio Supreme Court that the jury be able to determine the weight of the evidence.

{¶14} The final issue raised under the second assignment of error is that the trial court committed plain error by not giving an instruction on an independent intervening cause of death when the entire defense was premised upon the notion that McClure was the cause of her own death by pulling on the driver's arm causing the motorcycle to leave the road.  A review of the record reveals that at no time did Sayre request an instruction for an independent intervening cause of death.

> **In reviewing the sufficiency of jury instructions given by a trial court, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case.** *State v. Wolons* **(1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443.  A strong presumption exists in favor of the propriety of jury instructions.** *Burns v. Prudential Secs., Inc.,* **167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621, ¶ 41.  Generally, the trial court should give requested jury instructions "if they are correct statements of the law applicable to the facts in the case."** *Murphy v. Carrollton Mfg. Co*. **(1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828. Instructions that in their**

-15-

**totality are sufficiently clear to permit the jury to understand the relevant law will not be the cause of a reversal upon appeal. *Burns* at ¶ 41. Whether the jury instructions correctly state the law is a question of law, which we review de novo. *Murphy* at 591.**

*Schnipke v. Safe-Turf Installation Group, L.L.C.*, 190 Ohio App.3d 89, 2010-Ohio-4173, ¶30 (3d Dist.). Since Sayre failed to request the jury instruction, we would review any alleged error with a plain error standard. *State v. Stallings*, 89 Ohio St.3d 280, 2000-Ohio-164, 731 N.E.2d 159.

{¶15} Here, Sayre claims that the trial court committed plain error by failing to *sua sponte* give a jury instruction on an independent intervening cause of death. Sayre argues that his defense was based upon the theory that the accident occurred not because he was intoxicated and missed the turn, but on the theory that McClure was intoxicated, lost her balance, and grabbed his arm while he was driving the motorcycle to prevent herself from falling. Sayre claims that this action by McClure was what caused him to leave the road and crash the motorcycle, with the crash leading to the death of the decedent. However, Sayre cites to no authority that would require the trial court to sua sponte give a jury instruction on the defense's theory of the case. A review of the Ohio Jury Instructions ("OJI") shows that the instructions given by the trial court complied with Ohio Law. OJI §417.23. The trial court gave an accurate recitation of Ohio

Law as to other causes and intervening causes. OJI §417.25. In addition, the correct instruction for an independent intervening cause of death is as follows.

> **INDEPENDENT INTERVENING CAUSE OF DEATH. If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was [caused by another person], the defendant who inflicted the original injury is not responsible for the death.**

OJI §417.25(3). Since the injuries caused by the accident were what caused the death of the decedent, this instruction would not have exonerated Sayre. Thus, any error would be harmless. Having found no prejudicial error in the issues raised by the second assignment of error, the second assignment of error is overruled.

{¶16} In the third assignment of error, Sayre claims that the trial court erred by making prejudicial comments.

> **The judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue.**

R.C. 2945.03. In doing so, the trial court must be careful as to any comments it makes that may have an effect upon the jury. *State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978) (vacated and remanded on other grounds).

> **It must be noted that no absolute prohibition exists to preclude comment by a court during trial. It must also, however, be borne in mind that '* * * the influence of the trial judge on the jury is necessarily and properly of great weight * * *.'"**

*State v. Thomas*, 36 Ohio St.2d 68, 71, 303 N.E.2d 882 (1973) (quoting *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841). "It is well known, as a matter of judicial notice, that juries are highly sensitive to every utterance by the trial judge, the trial arbiter * * *." *Bursten v. United States*, 395 F.2d 976, 983 (C.A. 5, 1968).

> **Generally, in determining whether a trial judge's remarks were prejudicial, the courts will adhere to the following rules: (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.**

*Wade, supra* at 187. "'In exercising his duty to control a criminal trial pursuant to R.C. 2945.03, the trial judge is to remain impartial and refrain from making comments which may influence a jury.'" *State v. McCarley*, 9th Dist. Summit No. 22562, 2006-Ohio-1176, ¶9 (quoting *State v. Boyd*, 63 Ohio App.3d 790, 794, 580 N.E.2d 443 (1989)). "A judge's 'participation by * * * comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on * * * the credibility of a witness.'" *Id.* (quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970)). "In determining whether a trial judge's remarks are so prejudicial as to [be harmful], we must

consider the circumstances under which they were made." *State v. Ward*, 3d Dist. Allen No. 1-97-56, 1998 WL 165006 (April 1, 1998).

{¶17} In this case, Sayre points to a few instances where the trial court made comments concerning a witness. The comments were made during cross-examination and taken in context were as follows.

> **Q. Okay. And you admit that you did have to come in because your hoodie was tied so tight?**
>
> **A. Yes, sir.**
>
> **Q. You needed help to get it off?**
>
> **A. I already answered this once, yes, sir.**
>
> **Q. I understand, that was on Direct. And you had to have her untie it for you?**
>
> **A. Yes, sir.**
>
> **Q. Wasn't that because you were so intoxicated you couldn't do it yourself?**
>
> **A. No, sir, it's because I ain't got eyes in my chin.**
>
> **Q. It's a yes or no question.**
>
> **A. No, sir.**
>
> **Q. And – so you agree pretty much with everything Donna Galati says and what Amber Sexton says except again when she said you were intoxicated or trashed?**
>
> **A. No, sir, I don't agree with nothing they said because all they're doing is try (sic) to incriminate me.**

**Q.   That's it.  What I'm saying is you agree with 'em up to the point it incriminates you?**

**A.    I don't remember agreeing with 'em.**

**Q.   Okay.  You went to their house right?**

**A.   I said that.**

**Q.   Okay.  You passed Donna in the hallway?**

**A.   I said that.**

**Q.   You said that Amanda was up there, you were up there?**

**A.   And I said that.**

**Q.   And you said they helped untie the string that – that had to happen, right?  I know you've said all that sir, what I'm saying is you agree with 'em up to the point it incriminates you, isn't that true?**

**A.   I don't see nothing incriminating about answering the questions that I've answered.  When you are talking about them purposely making lies to incriminate me I don't agree.**

**Q.   Okay.  That's what my point is.  When they come to the point when they say your (sic) were intoxicated that's when you don't agree with 'em?**

**A.   No, sir.**

**Mr. Coulter:   Just for the record I'm going to object to the repetitiveness of the questions and bordering on the badgering for the record.  Thank you, Your Honor.**

**The Court:  He is on Cross and your client's not answering his questions.  Let's continue.**

Tr. 681-83.

Q.   * * *[T]his dent goes from the outside of your gas tank into here, makes a dent right?

A.   No, sir, that's the left side of my –

Q.   The left side?

A.   The right side of my head bouncing off the left side of the gas tank.

Q.   So your body came over like that?

A.   No, sir, my body's like that.

Q.   You just told me the right side of you head hit the left side –

A.   The right side of my head hit the left side of the gas tank.

Q.   The right side of your head?

A.   The right side of my head.

Q.   This side?

A.   Yes, sir.

Q.   This is my left.  So your head had to go like that?

A.   How big is a gas tank, sir?

Q.   Did your head have to go like that?

A.   No, sir, my head bounced off the gas tank.

Q.   Well you're showing going straight down?

A.   No, I'm showing to the right.  I'm sorry, excuse me, I don't understand your line of questioning here.

Q.   Well first –

**A.** Because you're not a vehicle – this is not what you do right?

**Q.** Well look at that dent. That's a crease, isn't it?

**A.** No, that's a dent from my head.

**Q.** Let's look then. These have already been identified, they're true and accurate, these pictures of your motorcycle after the accident, right?

**A.** Yes, sir.

**Q.** State's Exhibit 16, same dent, it's on the left side – isn't that a scraping motion into that dent, see where the paint's been peeled off?

**A.** No, the paint – the paint will flex and peel off, the paint will flex and crack right off.

**Q.** So you're saying that your head made that crease all the way across there?

**A.** Yes, sir.

**Q.** Let's show it a little better. State's Exhibit 17.

**A.** That's beautiful.

**Q.** It starts on the left and goes to the right. See the crease?

**A.** Sir, I can't explain it to you no more. I mean, I hit my head on the gas tank that caused the dent. That's all I can say.

**Q.** Can you see how that's not possible.

**A.** That is very possible.

**Q.** How did your head make that crease?

A.   Just like that, sir.

Q.   You just went to your left side with the left side of your head?

A.   No, I didn't –

Mr. Coulter:   I think we asked and answered, asked and answered, objection for the record.  Thank you.

A.  Yeah.

Mr. Yager:  He's not answering.

Mr. Coulter:  He's not answering the way you want him to.

Mr. Yager:  I'll move on, Your Honor.

The Court:  I don't think you're gonna get to the bottom of this. Let's go.

Tr. 698-700.

Q.   * * * Can you explain to me how seven hours later you're testing .064 still?

A.   I have a –

Mr. Coulter:   Objection.  That's for the experts rather than himself –

The Court:  Hold it.  He's entitled to ask that.

Mr. Coulter:  Okay.

A.   I have a blood blockage disease, sir.  I take blood thinners and blood pressure meds.

Q.   So you're saying that's why you tested so high?

-23-

**A.** **I didn't think it was high. It wasn't over the legal limit, right?**

**Q.** **It's seven hours later.**

**A.** **And all I'm doing is laying there getting fed morphine.**

**Q.** **Okay. Let's go –**

**A.** **I'm not up jogging around eating.**

**Q.** **When Mike Wheeler said that he smelled alcohol and you appeared intoxicated at the scene, is he lying?**

**A.** **I'm not sure who Mike Wheeler was.**

**Q.** **The Deputy Sheriff, our first witness?**

**A.** **Is that the one that said he was on the scene before the EMT or after the EMT?**

**Q.** **He's the first one that testified.**

**A.** **So was he there before the EMT or after, I don't understand.**

**Q.** **Sir, you don't ask the questions, I do.**

**A.** **No, he was not the first person on the scene.**

**Q.** **I didn't ask you that. I asked you when he said he smelled alcohol on you and stated that you were intoxicated and he saw bloodshot, glassy eyes and slurred speech, is he lying about that?**

**A.** **I don't think there was ever any test at that time to say that I was intoxicated, sir.**

**Q.** **I'm gonna get to that in a minute, too. But you're not answering my question, is he lying?**

**A. I'm trying maybe I don't understand, sir.**

**Q. Then I'm gonna move on because you don't seem to want to answer my questions.**

**When this Trooper said he got there, he smelled a strong odor of alcohol coming from your breath, that you appeared intoxicated, you had bloodshot, glassy eyes, you had slurred speech, is he lying or is he wrong?**

**A. That was his observation, sir. I cannot judge that.**

**Q. Alright. When he stated in his experience as a Trooper that you were impaired and under the influence of alcohol, how about that? Was that true, is that true?**

**A. I don't think there was ever any test performed at that time to prove that, sir.**

**Q. I know there wasn't. I'm asking you is he telling the truth about that or is he lying?**

**Mr. Coulter: I'm gonna object to this is (sic) all repetitiveness, the question is whether or not he was intoxicated not what his opinion was – just repeat through every witness –**

**The Court: I don't think you're gonna get an answer. Move on.**

Tr. 706-09. A review of the record indicates that the trial court was frustrated with the testimony of Sayre and may have indicated as much to the jury. The comments may have implied that the witness was not credible and that the defendant was being evasive with his answers. A trial judge must be cautious not to relay frustration with a testifying witness to the jury. *McCarley, supra.*

{¶18} Although the comments may have been questionable, that does not make them prejudicial. Under the test set forth in *Wade*, the defendant has the burden of showing prejudice. This court must also look to see if the trial court took any steps to remedy the effect of any comments. *Wade, supra.* When a trial court gives an appropriate jury instruction ordering the jury to disregard any comments of the judge, the damage of the comments can be mitigated. *Ward, supra.* Here, the trial court specifically instructed the jury as follows.

> **You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence. To weigh the evidence you must consider the credibility of the witnesses, including all who testified. \* \* \***
>
> **\* \* \***
>
> **If during the course of the trial the Court said or did anything that you consider an indication of the Court's view of the facts, you are instructed to disregard it. Likewise, if it appears to you that the Court has emphasized any portion of this instruction to favor either the State of Ohio or the Defendant, no such emphasis was intended and you are instructed to disregard it.**

Tr. 851-52, 859. Given the instructions to the jury to disregard the statements of the trial court, Sayre has not met his burden of demonstrating prejudice to the defendant by the comments. Thus, the third assignment of error is overruled.

{¶19} Sayre claims in the first assignment of error that the verdict is against the manifest weight of the evidence. The question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.

> **Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 514 (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Id. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings of fact made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998).

{¶20} The first witness for the State was Marion County Sheriff's Deputy Michael Wheeler ("Wheeler"). Wheeler testified that he was the first on at the scene of the accident at issue in this case, before the arrival of the ambulance. Tr. 180. Wheeler testified that when he spoke with Sayre, he could smell alcohol on his breath and Sayre had bloodshot eyes, slurred speech, and slow motor skills. Tr.

181. All around the scene were beer cans. Tr. 181. Although it appeared that Sayre was in pain, he did not mention it. Tr. 183. On cross-examination, Wheeler testified that he did not conduct any sobriety tests. Tr. 188-89. He also testified that he did not check to see if the beer cans were empty, full, or broken. Tr. 193. He also testified that there was nothing unusual about a smoker under stress wanting to have a cigarette. Tr. 195-96. However, on cross-examination, Wheeler testified that there was no doubt in his mind that Sayre was intoxicated the night of the accident. Tr. 198.

{¶21} The second witness for the State was Kokas. Kokas testified that he was there before any police officer. Tr. 204, 222. Kokas' first action was to check on McClure as she appeared to be more seriously injured. Tr. 204. Finding no heart rhythm or respiration, McClure was pronounced dead at the scene and Kokas turned his attention to Sayre. Tr. 205. Kokas noted that Sayre appeared to have broken bones in his right leg and that he smelled a moderate degree of alcohol about his person. Tr. 206-207. Although Sayre was showing signs of pain, it was not as severe as Kokas expected given the injuries suffered. Tr. 207. Kokas also noted that Sayre's speech appeared slightly slurred. Tr. 208. When Kokas asked Sayre about ingestion of alcohol or drugs, Sayre told him that he had some to drink, though he did not specify an amount. Tr. 209. On cross-examination, Kokas admitted that the behavior he observed that could be attributed to

intoxication could also be attributed to shock. Tr. 213. The Glass Coma Scale rating was applied to Sayre. Tr. 214. The higher the score, the more oriented and appropriate the person is. Tr. 214. On a scale of 1 to 15, Sayre scored a 15 indicating that he was very oriented. Tr. 215-17.

{¶22} Booth was the second EMT that came to the scene with Kokas. Booth testified that he helped treat Sayre at the scene. Tr. 229. He testified that the injury was very painful, but Sayre did not appear to be in that much pain. Tr. 229-30. Booth also testified that he smelled alcohol on Sayre. Tr. 230. On cross-examination, Booth testified that he could not tell whether Sayre was intoxicated or not. Tr. 236. Booth also testified that it is difficult to tell the difference between a person suffering from a head injury and a person who is intoxicated. Tr. 240-41.

{¶23} Shockey testified next for the State. As discussed above, Shockey testified that he went to the scene and took pictures during the day. He also examined the tires on the motorcycle. Tr. 246-47. Shockey testified that there were no problems with the motorcycle other than it had been in a wreck. Tr. 248. He also testified that it appeared that the motorcycle had left the roadway in a straight line until it hit the fence. Tr. 249. Shockey was not able to testify as to the cause of the accident. Tr. 268.

{¶24} The next witness for the State was Cassandra Friar ("Friar"). Friar testified that McClure was her best friend and she last saw her on the date of the

accident. Tr. 273. Friar testified that McClure and Sayre came to her house that evening between 9:30 and 10:00 pm. Tr. 274. McClure and Sayre brought a 12 pack of beer with them and they both drank some of it. Tr. 276. She also testified that she observed Sayre taking some Vicodin and that he smoked marijuana with her. Tr. 276-77. When Sayre entered her home, she described him as staggering. Tr. 278. The couple was at her home for 40-45 minutes before they left. Tr. 278. When they attempted to leave, the motorcycle fell over. Tr. 279. On cross-examination McClure admitted that she was testifying to avenge the life of [her] friend." Tr. 296.

{¶25} Donna Galati ("Galati") is McClure's mother. She testified that she saw McClure and Sayre at her son's home the evening of the accident. Tr. 302. She testified that she smelled alcohol on Sayre that evening, that his eyes appeared glazed, and he appeared off balance. Tr. 303. On cross-examination she admitted that she only saw Sayre in passing and did not spend any time with him. Tr. 307. She also admitted that she did not currently like Sayre and had never liked him. Tr. 310. She also admitted that McClure was intoxicated the night of the accident. Tr. 311.

{¶26} Amanda Sexton ("Sexton") testified that she saw McClure and Sayre the night of the accident between 10:00 and 11:00 pm at her home. Tr. 317. She testified that McClure seemed out of it. Tr. 317. Sayre seemed very drunk in

Sexton's opinion. Tr. 318. Sayre was staggering around and was unable to untie a hoodie he had tied. Tr. 318. On cross-examination Sexton testified that Sayre was able to maneuver the stairs without any problem. Tr. 323. She also admitted that she had "hard feelings for him" because of what happened to McClure. Tr. 330.

{¶27} The eighth witness for the State was Ohio State Trooper Frank Applegate ("Applegate"). Applegate was sent to the hospital to get a blood sample from Sayre to test his blood alcohol level. Tr. 337. When he arrived, Sayre was receiving a CAT scan. Tr. 337. Although he tried to explain to Sayre what he wanted, Sayre did not seem to understand that this blood draw was different from the one done by the hospital. Tr. 338. Eventually Applegate gave up and marked the form as a refusal. Tr. 338. Applegate testified that Sayre's demeanor was uncooperative and that Sayre appeared to be impaired. Tr. 338-39. Applegate observed an odor of alcohol along with glassy and bloodshot eyes. Tr. 339. On cross-examination, Applegate testified that he knew Sayre was injured, but did not know the extent of the injuries or the effect they had on Sayre. Tr. 343-46. Other than requesting a blood test from Sayre, Applegate had no involvement with the case. Tr. 347. Applegate testified that he based his opinion that Sayre was intoxicated on the odor of alcohol and the fact that Sayre's eyes were bloodshot and glassy. Tr. 350.

{¶28} The State next presented the testimony of Clark. Clark testified that on the night of the accident, she was driving and saw a motorcycle close to the middle line. Tr. 355. She testified that she passed it and when she looked back, she saw it had wrecked. Tr. 355. She noticed the wreck because as she pulled into the parking lot of her employer, she noticed the headlight go down and back up, so she watched it go off the road, into the ditch, and up the other side. Tr. 356. At the time she passed the motorcycle, the passenger appeared to be limply holding the driver. Tr. 356-57. On cross-examination, Clark testified that she saw the motorcycle veer quickly to the left, then right, as if it were losing control. Tr. 368. The turns looked "jerky". Tr. 370. By the time the driver corrected from the quick right turn, the motorcycle was lying on its side and sliding across the road. Tr. 370. Clark admitted that she did not see everything that happened because she caught a glimpse of the swerving in her rearview mirror while turning, completed her turn, and then turned around to see the motorcycle leave the road. Tr. 377.

{¶29} Jan Gorniak ("Gorniak"), who was the Franklin County Coroner at the time of the accident, testified next for the State. Gorniak testified that she conducted the autopsy on McClure. Tr. 383. The cause of death was determined to be blunt force injuries of the neck and chest due to a motorcycle crash. Tr. 384. Gorniak also testified that the toxicology test revealed that McClure had a blood alcohol level of ".26 gram percent." Tr. 388.

{¶30} The eleventh witness for the State was Williams. Williams was the primary investigator of this accident. Tr. 402. When Williams arrived on the scene other officers and the EMT's were present. Tr. 402. The motorcycle was lying on its right side and Sayre was sitting on the ground holding a cigarette. Tr. 402. There were several Bud Light cans scattered around the scene and a torn cardboard box in which the cans were originally located. Tr. 403. Farther to the east was the body of McClure. Tr. 403. Williams, as discussed earlier, testified that Sayre had a strong odor of alcohol around him. Tr. 404. In addition he had red, bloodshot, and glassy eyes, and his speech was slurred. Tr. 404. Sayre's dexterity appeared to be impaired and he did not appear to be in severe pain even though his injuries were severe. Tr. 408. There was no indication on the road that the motorcycle swerved or struck the road. Tr. 408. Williams testified that based upon the tire marks at the scene, it appeared that Sayre "failed to negotiate the curve and drove straight off the south side of the road." Tr. 409. When interviewing Sayre at the hospital seven hours later, Williams noted that Sayre's speech was much improved. Tr. 409. During the interview, Sayre admitted to having two and a half beers that evening with the last one being around 9:30 pm. Tr. 410. Sayre told Williams during the interview at the hospital that a vehicle came around the curve and was drifting into his lane. Tr. 413. Sayre then stated that he moved to the right and the tailwind of the truck sent the motorcycle

sideways and he went straight into the ditch. Tr. 413-14. Williams testified that Sayre's explanation that was given during the interview as to what happened was not plausible. Tr. 414. Williams based his conclusion on the physical evidence showing where Sayre left the road and the lack of yaw marks on the road that should have been there if the accident occurred the way Sayre described. Tr. 415. Williams also testified that although Sayre claimed to only have drunk two and a half beers, he appeared substantially more intoxicated than if he had only drunk that amount. Tr. 430.

{¶31} On cross-examination, Williams testified that none of the eleven cans of beer found at the scene appeared to have been consumed. Tr. 444. Approximately half of the cans were unbroken, but the remainders were damaged by the impact. Tr. 444. The twelfth can was found in McClure's pocket. Tr. 445. Williams also testified that he was not an accident reconstructionist. Tr. 445. Williams admitted that the accident could have been the cause of the impairment in motor skills that he observed. Tr. 453.

{¶32} Mark Hiatt ("Hiatt") also testified for the State. Hiatt was employed with the Ohio State Highway Patrol Crime Lab. Tr. 478. He tests various bodily fluids for the presence of alcohol. Tr. 479. Hiatt testified that he conducted the blood alcohol tests on Sayre's blood samples. Tr. 482. The results indicated that

Sayre's sample contained .064 grams of alcohol per 100 milliliters of whole blood. Tr. 483.

{¶33} The final witness for the State was Harry Plotnick ("Plotnick"). Plotnick is a consultant in forensic toxicology and a practicing attorney in the area of divorce and bankruptcy. Tr. 505. Plotnick testified that he extrapolated the results of Sayre's blood alcohol test to determine Sayre's blood alcohol at the time of the accident. Tr. 510. Plotnick testified as follows.

> **A. Based upon generally accepted scientific principles with respect to the disappearance of alcohol from the bloodstream I concluded that the blood alcohol level at the time of the this collision about 9:30, that the blood alcohol level was not less than a .16 grams per milliliters of blood (sic).**

Tr. 510-11. Based upon his calculations, Plotnick testified that most individuals would be impaired at that level. Tr. 515. He also testified that based upon all the indicators of intoxication, as testified to by the various witnesses, Sayre would have been "appreciably impaired by alcohol at the 10:25 time of the accident." Tr. 516. On cross-examination, Plotnick testified that his calculations are based on the averages, but could be different for an individual person. Tr. 523. He also admitted that it was possible that the presence of other drugs could interfere with the metabolism and excretion of the alcohol. Tr. 525. Plotnick agreed with defense counsel that if the original result of .064 was incorrect, then his findings would be incorrect as well. Tr. 525.

{¶34} At the conclusion of the State's case-in-chief, Sayre presented numerous witnesses of his own. The first was Williams, who earlier testified for the State. Williams testified that there were eleven beer cans found at the scene with five being full and six being empty. Tr. 548-49. He had previously testified that the empty cans had been damaged upon impact and were not consumed. Williams testified that there were cans that were extremely close to Sayre and may have exploded on him. Tr. 550. Williams also testified that there was damage to the fuel tank of the motorcycle. Tr. 552.

{¶35} Sayre's second witness was Bascomb McKenzie ("McKenzie"), who is a friend of Sayre. McKenzie testified that Sayre always speaks with a "gravelly slur." Tr. 555. McKenzie testified that he has spent time around Sayre when he is intoxicated and that Sayre's speech becomes garbled. Tr. 557. McKenzie spoke with Sayre around 8:30 or 9:00 pm on the night of the accident. Tr. 556. Based upon his experience with Sayre, Sayre did not sound intoxicated. Tr. 557.

{¶36} Pamela Gaines ("Gaines"), Sayre's mother, testified next on his behalf. Gaines testified that she saw Sayre in the afternoon before the accident. Tr. 561. At that time she saw no indication that Sayre was intoxicated. Tr. 564. She testified that while Sayre was in the emergency room, he was very upset and in a great deal of pain. Tr. 565. The emergency personnel gave him some injections to try to ease the pain. Tr. 565. Gaines also testified that the second

interview with the police was soon after they gave Sayre the injections before taking him to surgery. Tr. 566-67.

{¶37} John Galati, Sr. ("J. Galati"), the father of McClure, testified next for Sayre. He testified that Sayre's truck had been in his driveway for a month, but was gone the day of the accident. Tr. 569-70. J. Galati presumed that Sayre had managed to fix it, but did not see either Sayre or McClure on the day of the accident. Tr. 571.

{¶38} The fifth witness for Sayre was Edward Yingling ("Yingling"), who was a criminalist at the Ohio State Highway Patrol Crime Lab. Tr. 576. Yingling conducted the toxicology test to determine whether Sayre had any drugs in his system at the time of the accident. Tr. 579. The screen returned a positive result for marijuana. Tr. 582. However, further testing showed a negative test for marijuana. Tr. 583.

{¶39} Calvin McGuire ("McGuire") was the chief toxicologist for the Franklin County Coroner's Office. Tr. 590. McGuire testified that he ran the toxicology tests on McClure. Tr. 591. The testing showed that McClure had a blood alcohol level of .26 grams. Tr. 593. McGuire then testified that this amount would be considered a "toxic value", meaning it could cause serious damage. Tr. 593. McGuire also testified that the amount of glucose would not have affected

the results of the test in this case due to collecting the sample soon after death. Tr. 594.

{¶40} Sayre then testified on his own behalf. He testified that he had suffered cancer of the throat, neck and face on two different occasions. Tr. 597. As a result, half of his voice box and a couple of nerves from the bottom of his tongue were removed. Tr. 597. The last surgery was completed in January of 2007 and he was just learning to get past the speech impediment caused by the surgery. Tr. 597-98. On the day of the accident, Sayre and McClure left his house on the motorcycle to look for a car for his daughter. Tr. 604. Then they went back to his home to eat and he had less than a full beer. Tr. 605. McClure and Sayre then decided to go to Friar's house, but stopped for a six pack, some cigarettes and some gum on the way. Tr. 607. They arrived at Friar's home as it was starting to get dark. Tr. 609. As it got later, Sayre asked if they could stay there since McClure was not dressed for the cold, but Friar refused. Tr. 609-10. Friar then loaned McClure a coat, a pair of sweat pants, and a pair of gloves. Tr. 610. While at Friar's home, Sayre had a beer and a half. Tr. 611. Sayre testified that McClure had at least four beers while they were there and that Friar was smoking marijuana. Tr. 612. Sayre denied that he had smoked any of the marijuana. Tr. 612. Sayre also denied that he snorted Vicodin and testified that he is allergic to

Hydrocodone. Tr. 615. Sayre testified that they left Friar's home around 9:15 and then went to McClure's brother's home.

{¶41} On the way to the brother's home, Sayre and McClure stopped at a gas station and purchased cigarettes, a 12 pack of Bud Light and a Mountain Dew. Tr. 618. Once at the house, Sayre and McClure planned on spending the night, so Sayre took off his leather coat and chaps. Tr. 620. He had a hoodie on that was knotted under his chin and he could not get the knot undone. Tr. 620. Sayre then went upstairs to have McClure untie the knot. Tr. 621. Once the knot was untied, Sayre went back downstairs. Tr. 621. The stairs were very steep in this home. Tr. 621. Sayre testified that he needed McClure to undo the knot because he could not see it. Tr. 623. When he left the house, he passed Galati and McClure's children who were on their way upstairs. Tr. 624. While downstairs, Sayre heard loud screaming and cursing coming from Galati and McClure. Tr. 625. Soon after the fight, McClure and Sayre left. Tr. 625.

{¶42} When they left the house, the 12 pack of beer was in the saddlebag on the rear of the bike. Tr. 627. Due to the cold weather, they were only traveling at about 45 miles per hour. Tr. 628. At that time, McClure was upset and was not holding on or properly positioned behind Sayre. Tr. 628. Neither Sayre nor McClure was wearing a helmet. Tr. 629. Sayre testified that while they were riding, McClure's foot came off the foot peg. Tr. 630. Concerned that McClure

was no longer stable, Sayre turned on the cruise control and reached back with his right hand to help her place her foot back on the peg. Tr. 631. Then Sayre saw a vehicle coming around the curve with its bright lights on, and it appeared to be drifting into his lane. Tr. 632. Sayre then moved the motorcycle to the right. Tr. 632. Sayre could feel the air from the passing vehicle hit the motorcycle. Tr. 633. McClure then started falling to the right and Sayre reached back with his right hand to try and stop her. Tr. 633. Sayre then testified that in a panic, McClure grabbed at his left elbow to catch herself, which twisted the handle bars to the left. Tr. 634. The motorcycle then went down into the ditch and McClure fell off the bike. Tr. 634. Sayre testified that as she went off, her foot caught him in the back of the head and his head bounced off the gas tank. Tr. 634. With the cruise control activated, the bike continued to go 45 miles per hour. Tr. 634. As he was attempting to slow the motorcycle, his right foot caught in the embankment, causing it to break. Tr. 634. When Sayre fell off the motorcycle, the contents of the saddlebag fell on him, with some of the cans exploding and spraying him with the beer. Tr. 638.

{¶43} After the accident, Sayre testified that he did not know where McClure was and that he was in severe pain. Tr. 639. His leg was bent underneath him. Tr. 640. Sayre then stated that he found the cell phone, but couldn't make a call, so he waved it to try and attract attention from a passing

vehicle. Tr. 640. Once someone saw him, he realized that his cigarettes were laying on him, and realized that he wanted a cigarette to calm his nerves. Tr. 641. When the EMT's arrived, he told them he was fine, but he did not know where the passenger was. Tr. 642. Sayre testified that he was dizzy from hitting his head and could not recognize anyone around him. Tr. 642. Sayre also testified that he could not see anyone because his glasses were lost in the accident. Tr. 643-44. After being placed in the ambulance, Sayre's first memory was waking up in the helicopter. Tr. 644. At that time, Sayre had lost track of time and they were giving him injections of various medications. Tr. 644-45. The first person, besides hospital personnel that Sayre remembered seeing was Applegate. Tr. 646. Sayre testified that he could not understand Applegate and that he was very dizzy. Tr. 647. Sayre then remembers speaking to Williams just before going into surgery. Tr. 648. Sayre testified that he remembered answering questions for Williams, but everything was confusing due to the medications he had been given. Tr. 650-654. On cross-examination, the State questioned Sayre about his version of the events and about the inconsistencies between Sayre's version and those of the other witnesses. Sayre continued to testify to the same version given at trial. He admitted that he may not have told Williams about McClure's actions at the time he was interviewed in the hospital. Tr. 709.

{¶44} The eighth witness for Sayre was Enver Ozer ("Ozer"). Ozer was the surgeon who treated Sayre for voice box cancer in 2007. Tr. 657. To treat the cancer, Ozer removed a significant portion of Sayre's voice box. Tr. 657. The cancer reoccurred in 2009 and another surgery in January of 2010. Tr. 658. As a result, Ozer had to remove a portion of Sayre's carotid artery and a nerve going to the tongue, as well as a portion of the face. Tr. 658. This surgery resulted in one side of Sayre's tongue being paralyzed. Tr. 659. Ozer testified that the two surgeries affected Sayre's ability to speak. Tr. 659. The surgery would affect the quality of the voice and the ability of the tongue to articulate. Tr. 660.

{¶45} Sherry Patton ("Patton") also testified on Sayre's behalf. Patton teaches the Ohio Safety Court for motorcycles at the Ohio Department of Public Safety, Delaware Areas Career Center, and A.D. Farrow Company. Tr. 727. They instruct motorcycle drivers to have passengers keep their feet on the foot pegs so that they will move with the driver. Tr. 729. If a passenger has their feet off the pegs, it can throw the motorcycle off balance. Tr. 729. Drivers are also taught to tell passengers not to make any sudden or abrupt movements. Tr. 730. Patton testified that if a motorcycle goes into a curve with the driver leaning one way and the passenger leaning the other, the motorcycle will continue going straight rather than turning with the curve. Tr. 730. Drivers of motorcycles should never take a passenger who has been drinking, as they could easily fall off the bike while in

motion due to loss of balance and equilibrium. Tr. 731. Having the passenger on a raised rear seat affects the center of gravity of the motorcycle. Tr. 732.

{¶46} Robert Belloto Jr. ("Belloto") testified next for Sayre. Belloto is a pharmacist at Good Samaritan Hospital in Dayton. Tr. 735. In addition Belloto does forensic toxicology consulting in the area of pharmacokinetics. Tr. 736. Pharmacokinetics is the area that determines the amount of time various substances will spend in the blood stream and how various factors affect that time. Tr. 736-37. Belloto testified that he reviewed all of the medical records and test results along with Plotnick's report. Tr. 738-39. Belloto testified that the original number used by Plotnick, the .064, could be off by 20% to 40%. Tr. 747. Belloto also testified that Plotnick's use of the median elimination rate could substantially affect his results. Tr. 748. In addition, the rate of absorption and elimination can be affected by many factors. Tr. 748.

> **Q. What can affect the rate of elimination of an individual?**
>
> **A. Well, it's not just elimination, it's absorption, when people are ill or injured then funny things start to happen. I mean, pharmacokinetics, that's why we monitor – that's why we take blood levels because although there may be a theory that says this drug is eliminated at a constant rate above a certain blood level, that doesn't always – doesn't always work out that way.**
>
> **\* \* \***
>
> **Q. Okay. Are there other factors than what you've already mentioned in terms when you start talking about whether a**

> **person is a regular drinker or not that affects this rate of elimination?**
>
> **A.   Well, is what you see is – with alcohol generally you see something that looks like a triangle.   Because people generally drink at a constant rate and then it's eliminated at a constant rate.   But it depends if you're drinking very fast that occurs change, so it's not always that simple.**

Tr. 748-49.  Belloto also testified that the volume of water content, weight, and frequency of drinking, i.e. heavy drinkers versus social drinkers, affects the rate the alcohol is metabolized.   Tr. 749-50.   According to one study, back extrapolating to determine the amount of alcohol consumed is not reliable because of the risk of variable metabolism speeds and other errors.  Tr. 751.  With all the margins of error added together, the prediction is essentially worthless.  Tr. 751.  In addition, the greater the length of time over which the extrapolation is made, the greater the risk of error becomes, so the results are less reliable.  Tr. 752.  Belloto testified that Plotnick's determination that absorption was complete was unreliable because it did not consider the factors of how much food had been consumed, which can reduce the rate of absorption by 50%.  Tr. 755.  If the rate of absorption is reduced, then the rate of elimination will be altered because the amount of alcohol in the blood will continue to change as the alcohol continues to be absorbed.  Tr. 755.

{¶47} Belloto then testified about the effect of injuries on the absorption and elimination of drugs.  Tr. 757.  According to Belloto, injuries can completely

stop absorption and elimination. Tr. 757. Thus, what normally would be absorbed within one hour could take up to four hours to be fully absorbed. Tr. 757. By assuming a constant rate of absorption and elimination taken from studies of healthy people, the results on a person who is injured or not healthy will not necessarily be accurate. Tr. 757. Belloto testified that in his experience from practicing at a hospital, real patients do not always follow the theories and the processes of absorption and elimination do not proceed at a constant rate. Tr. 758.

{¶48} Belloto testified that in Sayre's case, his injuries were significant enough to alter his drug kinetics. Tr. 760. Additionally, if samples of blood sit too long, even if collected in special test tubes, the glucose will ferment and turn to alcohol in the sample. Tr. 764. Based upon all the information before him and based upon his training as a pharmacist, chemist, dietician, and pharmacologist in kinetic pharmacology, Belloto testified that to a reasonable degree of scientific certainty, one could not tell what the actual blood alcohol level was at the time of the accident. Tr. 765-66. Belloto testified that the prediction interval was too large to be able to make a valid determination. Tr. 766.

{¶49} The final witness for Sayre was Todd Schultz ("Schultz") who is the owner of Todd's Auto Sales. Schultz testified that Sayre came to look at a car from him while on his motorcycle. Tr. 780. When he came in, there was no indication that he was intoxicated. Tr. 782.

{¶50} Here, Sayre was charged with operating a vehicle while under the influence and of aggravated vehicular homicide. Sayre's OVI charge was made under R.C. 4511.19(A)(1)(a), which requires the State to prove that Sayre was operating a motor vehicle while under the influence of alcohol. R.C. 4511.19(A)(1)(a). The statute does not require that he have a specific concentration of alcohol, such as would be required by R.C. 4511.19(A)(1)(b). If the jury finds that Sayre was under the influence while operating the vehicle, it then could determine whether his state of intoxication was one of the causes of death of McClure. A review of all the evidence in this case indicates that there was conflicting evidence about whether Sayre was impaired while operating the motorcycle. However, the jury was able to see the witnesses and weigh the credibility of the witnesses. There was evidence from which a reasonable juror could find that Sayre was under the influence of an intoxicating substance at the time of the accident. Thus, there was no manifest miscarriage of justice which would weigh heavily against conviction. The verdict is not against the manifest weight of the evidence and the first assignment of error is overruled.

{¶51} In the fourth and final assignment of error, Sayre claims that his trial counsel was ineffective. "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the

defendant of a fair trial.'" *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 105, 772 N.E.2d 81. The defendant must show that there was a reasonable probability that but for counsel's error, the result of the trial would have been different. *Id.* at ¶ 108. In support of his claim, Sayre lists eleven instances of alleged ineffectiveness of his trial counsel.

**{¶52}** Sayre first claims that his counsel was ineffective for improperly withdrawing a portion of a motion in limine concerning the three-hour rule. The three-hour rule is set forth by statute.

> **(b) In any criminal prosecution * * * the court may admit evidence on the concentration of alcohol, drugs of abuse, controlled substances, metabolites of a controlled substance, or a combination of them in the defendant's whole blood, blood serum or plasma, breath, urine, or other bodily substance at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within three hours of the time of the alleged violation. The three-hour time limit specified in this division regarding the admission of evidence does not extend or affect the two-hour time limit specified in division (A) of section 4511.192 of the Revised Code as the maximum period of time during which a person may consent to a chemical test or tests as described in that section. The court may admit evidence on the concentration of alcohol, drugs of abuse, or a combination of them as described in this division when a person submits to a blood, breath, urine, or other bodily substance test at the request of a law enforcement officer under section 4511.191 of the Revised Code or a blood or urine sample is obtained pursuant to a search warrant. Only a physician, a registered nurse, an emergency medical technician-intermediate, an emergency medical technician-paramedic, or a qualified technician, chemist, or phlebotomist shall withdraw a blood sample for the purpose of determining the alcohol, drug, controlled substance, metabolite of a controlled substance, or combination content of**

**the whole blood, blood serum, or blood plasma. This limitation does not apply to the taking of breath or urine specimens. A person authorized to withdraw blood under this division may refuse to withdraw blood under this division, if in that person's opinion, the physical welfare of the person would be endangered by the withdrawing of blood.**

R.C. 4511.19(D)(1)(b).

{¶53} The Ohio Supreme Court has held in *State v. Mayl* that "when results of blood-alcohol tests are challenged in an aggravated-vehicular-homicide prosecution that depends upon proof of an R.C. 4511.19(A) violation, the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm. Code Chapter 3701–53 before the test results are admissible." *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶48. In *State v. Hassler*, 115 Ohio St.3d 322, 2007-Ohio-4947, 875 N.E.2d 46, the Ohio Supreme Court expanded its holding on what is necessary to admit challenged blood tests. In *Hassler*, the defendant was charged with aggravated vehicular homicide for driving under the influence in violation of R.C. 4511.19(A)(1)(a), and causing the death of another as a result. The defendant's blood sample was not taken until seven and a half hours after the accident. On review the Court held that "a blood sample taken outside the time frame set out in R.C. 4511.19(D) is admissible to prove that a person was under the influence of alcohol as proscribed by R.C. 4511.19(A)(1)(a) in the prosecution for a violation of R.C. 2903.06, provided that the administrative

requirements of R.C. 4511.19(D) are substantially complied with and expert testimony is offered." *Id*. at ¶2.

**{¶54}** A review of the record in this case indicates that the blood draw was not done within the three hour time frame set forth by statute. The parties agree that the blood draw was done more than seven hours after the accident. Thus, for the blood sample to be admissible, the state would need to show that there was substantial compliance with the administrative requirements and offer expert testimony as to the validity of the sample. This was not done at either the motion to suppress or at trial when the level was provided to the jury. This court notes that the testimony of the expert witness was that he presumed the sample was accurate so that he could get an accurate result. This is not what the Ohio Supreme Court has required. Thus, the evidence may have been excluded, though we cannot say without a doubt it would have been because it was not challenged.

**{¶55}** However, even if counsel should have challenged the admission of the blood alcohol level and had it been excluded, this does not mean that the outcome of the case would have been different. Sayre himself admitted on the stand that he had been drinking, though not heavily. Several witnesses testified that he smelled of alcohol, had bloodshot and glassy eyes, had impaired movements, and had slurred speech. Williams even testified that when he observed Sayre the next day, his movements and speech were improved. Based

upon this evidence and the fact that Sayre was not charged with a per se violation of having too much alcohol in his system, the jury could reasonably find that Sayre was impaired in violation of R.C. 4511.19(A)(1)(a) even without the evidence of the exact level of the blood alcohol. Thus, the requirement that counsel's error would have changed the outcome is not met.

{¶56} Several of Sayre's alleged errors by counsel were counsel's failure to object to various things. Sayre's second claim of ineffective assistance of counsel concern counsels failure to object to leading questions. "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Evid.R. 611. The Ohio Supreme Court has recognized that the decision not to object to every possible error may be trial strategy and is not ineffective assistance of counsel. *State v. Keene*, 81 Ohio St.3d 646, 693 N.E.2d 246 (1998). Although the rules of evidence state that leading questions should not be used, it does not prohibit them on direct examination completely. *City of Parma v. Koumonduros*, 8th Dist. Cuyahoga No. 85315, 2005-Ohio-3713, ¶18. Even if it was error to allow the leading questions, there was substantial evidence presented through open-ended questions which would support the conviction. All the objection would have done would be to cause the State to rephrase the question. Thus, there is no reason to believe that the objections would have affected the outcome of the case.

{¶57} Counsel also failed to object to the opinions of the lay witnesses. As set forth above, lay witnesses are generally not permitted to offer opinion testimony. Evid.R. 701. Sayre claims that Williams and Shockey were permitted to give opinion testimony as to the cause of the accident without objection. Neither officer was an accident reconstructionist. The admissibility of these statements was discussed above. The statements were based upon the evidence they had personally observed. Thus, the statements were permissible. Since there was no error in the admission of the statements, trial counsel did not err by failing to object to the statements.

{¶58} Sayre claims that counsel erred by failing to object to the testimony of witnesses concerning the general conduct of impaired individuals. Sayre claims that counsel should have objected to the testimony of Wheeler and Williams as to how intoxicated people act in their experience. However, this testimony was based upon their observations of seeing numerous people who were intoxicated and it was based upon their own perceptions. Although it did call for a certain amount of speculation, there is no evidence in the record to indicate that the outcome would have been different if the testimony was not permitted. Both Wheeler and Williams testified that they noted the smell of alcohol about Sayre and that he appeared intoxicated by his physical features. In addition, Sayre himself admitted that he had been drinking. Thus, a reasonable juror could

conclude, even without the speculative testimony, that Sayre was impaired. Without evidence that the result would have been different, the alleged error is not ineffective assistance of counsel.

{¶59} Sayre claims that trial counsel erred by failing to object to prejudicial testimony that should have been excluded. Specifically, Sayre claims counsel should have objected to Williams' testimony that his own testimony was consistent with that of Clark, which should have been left to the jury to determine. A review of the record shows that Williams testified that Clark's testimony was not inconsistent, but was the result of a different viewpoint of the accident. Tr. 470. This testimony came up on redirect examination after Sayre's counsel questioned Williams about the difference between his testimony and that of Clark. This was done to show that Clark's testimony that it was drizzling did not match the testimony of the officers that the weather was dry. This was a question of trial strategy and not one of ineffective assistance of counsel.

{¶60} Sayre claims that trial counsel should have objected to Williams testimony that it was "ultimately determined [crash reconstruction] were not needed." Tr. 470. Sayre claims that this was a hearsay statement because it did not state who made that determination. Although Sayre is correct that the statement refers to a determination made by a third party, it is not a hearsay statement because it is not offered for the truth of the matter asserted, but rather

was just a statement as to why no accident reconstructionist investigated. Thus, there is no error in failing to object to the statement.

**{¶61}** Sayre also claims trial counsel should have objected to Williams' statement that Sayre was trying to blame the victim. However, a review of the record indicates that Williams did not make that statement.

> **Q. You've investigated a lot of cases, talked to a lot of Defendants, correct?**
>
> **A. Yes.**
>
> **Q. They lie to protect themselves?**
>
> **A. Yes.**
>
> **Q. Now he's coming into court today or defense counsel's coming into court today trying to blame the victim, is that correct?**
>
> **A. Yes.**

Tr. 476. The statement was made by the State in reply to cross-examination in which defense counsel alleged that it was McClure's actions that led to the accident and trying to explain why this was not relayed to Williams when he questioned Sayre initially. Placed into context, while the question was clearly leading, it was not overly prejudicial which would affect the outcome of the case. Thus, counsel was not ineffective by failing to object.

**{¶62}** The last bit of prejudicial testimony that Sayre believes should have been the subject of an objection was a question by the State to Sayre.

> **Q. You agree in State's Exhibit 8, and at the scene you never ever mention [McClure] grabbing you or in any way contributing to this crash.**
>
> **A. Sir, I believe I did. It's not in this statement. I was under a lot of medication at the time. I'm not sure what exactly I – statement I made.**
>
> **Q. It's not in here right?**
>
> **A. It wasn't wrote (sic) in here, sir.**
>
> **Q. So are you saying you told him, he didn't write it down, or you don't know?**
>
> **A. Possibly. I really don't know.**
>
> **Q. So you're saying he kept that out purposely?**
>
> **A. I'm saying that I was already under a lot of medication and I don't know what the statement was wrote and what wasn't wrote in the statement.**

Tr. 709. Placed into context, the offending question cited by Sayre does call for speculation. However, Sayre did not engage in speculation and merely answered that he did not know. Counsel could have strategically decided not to object since the answer did not harm his case. Even if he had objected and no answer had been given, there is no reason to believe that the outcome of the case would have been affected. Thus, trial counsel was not ineffective for not objecting to the question.

{¶63} Sayre next claims that counsel erred by failing to object to the State's repeated questioning of Sayre by asking him about the testimony of other witnesses, thus allowing Sayre's credibility to be damaged. A questioner only

needs a reasonable basis for asking any question meant to impeach a witness. Evid.R. 607(B). A review of the record indicates that the State questioned Sayre about how his testimony was contradicted by that of other witnesses. The State would then ask Sayre if he could explain the contradictions. This was cross-examination and thus the State had the right to question Sayre about why his story was significantly different from that of other witnesses. The State had a reasonable basis for asking the questions, so it could impeach Sayre in this manner.

{¶64} Sayre also claims that counsel should have objected to the State's commentary about Sayre's testimony while he was making it and the prosecutor's statement that the victim could not come to the courtroom to tell her story because she was dead. Although these comments may have been inappropriate because they were not questions, trial counsel may have determined that it was better not to be constantly objecting to every comment by the State. Thus, we cannot conclude that the failure to object was not a matter of trial strategy. In addition, these statements were not of such a nature that their omission would change the result of the trial. Thus, trial counsel was not ineffective for failing to object to these statements.

{¶65} Sayre claims that counsel was ineffective for failing to object to numerous instances of badgering. As discussed above, this could have been trial

strategy and did not affect the outcome of the case. Thus any error would not rise to the level of ineffective assistance of counsel.

{¶66} Sayre alleges that counsel was ineffective for introducing the blood alcohol level of McClure. One part of the defense was that it was McClure's actions due to her intoxication that caused the accident. To support this claim, counsel needed to show that McClure was intoxicated. The easiest way to do so was to have her blood alcohol content disclosed to the jury. The fact that the jury also heard from an expert that no motorcycle driver should allow a passenger who is intoxicated to ride was just part of the case that was going to come out when he claimed she was intoxicated. This was part of the trial strategy and as such is not ineffective assistance of counsel.

{¶67} Sayre next claims that trial counsel was ineffective for failing to introduce the reports of Ozer and Belloto. As to Ozer's report, there is no way to know what was in the report. Ozer testified that the throat cancer caused part of the voice box to be removed as well as a nerve to the tongue. Ozer also testified that such a procedure would affect Sayre's speech. Without some information as to the contents of the report, there is no way for this court to determine whether it would have been useful. Belloto's report, on the other hand, was discussed by the trial court outside of the jury's hearing. It was determined then that there was a great deal of inadmissible material in it which would require redaction before it

could be admitted. Belloto himself testified extensively to the contents of the report. Presumably he covered all of the material which would have been admissible. Thus, there was no harm in not admitting the reports when the experts themselves testified.

{¶68} Sayre also claims that trial counsel erred by failing to request a jury instruction on an Independent Intervening Cause of Death. As discussed above, the inclusion of an instruction on an Independent Intervening Cause of Death would not have exonerated Sayre. Although McClure's actions may have contributed to her own death, the cause of the injury was the motorcycle accident which was likely to produce death. If the jury determined that Sayre's impairment was one cause of the accident, even if there was another one as well, then it still could have found him guilty. Thus, the jury instruction in and of itself would not have changed the outcome of the case.

{¶69} Finally, Sayre claims that trial counsel should have objected to the prosecutor's statement in closing argument that his office and everyone who assisted did a good job. Tr. 816. Although the self-congratulatory statement may have been inappropriate and could have come across as arrogant if the jury were to find in favor of the defense, it is not evidence. In addition, the statement was followed by one in which the State told the jurors to reach a verdict consistent with the evidence. The trial court then instructed the jury that it is the sole

determiner of the facts and as to what the evidence means. There is nothing in the record to indicate in any way that an objection to these statements and an instruction to disregard them would have affected the verdict in any way. Thus, it was not ineffective assistance of counsel to not object.

{¶70} Having thoroughly reviewed the record, there is no evidence that trial counsel's representation was ineffective. None of the alleged errors of counsel would have affected the outcome of the case. Thus, the fourth assignment of error is overruled.

{¶71} Finding no error prejudicial to Defendant, the judgment of the Court of Common Pleas of Marion Ohio is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., concurs in Judgment Only**
**SHAW, J., concurs.**

**/jlr**