[Cite as *State v. Hemming*, 2021-Ohio-971.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28738 |
| | : | |
| v. | : | Trial Court Case No. 2019-CRB-4159 |
| | : | |
| BYRON R. HEMMING | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of March, 2021.

. . . . . . . . . .

LINDSAY E. BOZANICH, Atty. Reg. No. 0097356, Assistant Prosecuting Attorney, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
　　　Attorney for Plaintiff-Appellee

ANTHONY S. VANNOY, Atty. Reg. No. 0067052, 2624 Dryden Road, Suite 306, Dayton, Ohio 45439
　　　Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Byron R. Hemming was found guilty by a jury of sexual imposition, in violation of R.C. 2907.06(A)(1), a first-degree misdemeanor. Hemming appeals from his conviction, claiming that the trial court improperly limited his presentation of evidence, the prosecutor engaged in misconduct at trial, his trial counsel rendered ineffective assistance at trial, and his conviction was against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} The State's evidence at trial established the following facts.

{¶ 3} A.H. and her boyfriend, Sebastian Osborne, met when they were both serving in the United States Army, and they began dating around the summer of 2018. In March 2019, after both were discharged from the Army, they began staying with Osborne's brother. In June 2019, A.H. and Osborne began living with Osborne's mother, Anita Adams, and her fiancé, Hemming, in a trailer in Dayton. The arrangement was intended to be temporary – A.H. and Osborne were renovating the trailer next door.

{¶ 4} A.H. described the trailer as small – approximately 12 by 60 feet – with one bedroom, a bathroom next to the bedroom, a living room area, and a kitchen area on the opposite end from the bedroom. Adams and Hemming slept in the bedroom; A.H. testified that they kept the door open. Osborne and A.H. slept on a futon in the living room area. A.H. stated that she and Osborne had no privacy.

{¶ 5} The four had a good relationship most of the time. They played board games together, including Monopoly, Taboo, Risk, Cards Against Humanity, and others. However, A.H. also testified that she felt like an outsider.

{¶ 6} A.H. described Hemming as a "roommate." A.H. did not have intimate conversations with Hemming or flirt with him when they were alone. She stated that she would hug Adams, but not Hemming. A.H. testified that her relationship with Hemming became increasingly awkward as Hemming "was getting in [her] personal space" more frequently. A.H. stated that she avoided being alone in the same room with him. A few days before August 14, as A.H. was applying her make-up before going to work for an early shift, Hemming told her that she did not need make-up and was pretty.

{¶ 7} On August 14, 2019, A.H. and Osborne both were employed at O'Reilly Auto Parts; Osborne's shift began at 7:00 a.m., while A.H.'s shift began at 2:00 p.m. That morning, A.H. drove Osborne to work and returned to the trailer. Approximately 30 minutes later, Hemming came home from an anticipated court hearing on a child support matter; Hemming was upset because he had gone to the courthouse a day early. A.H. stated that Hemming went into the bedroom for approximately 30 minutes, and when he came out, he was wearing only pants. Hemming asked A.H. what tie he should wear to court the next day. Hemming then returned to the bedroom.

{¶ 8} When Hemming emerged from the bedroom again, he was wearing only gym shorts. A.H. was uncomfortable with Hemming's minimal clothing, and she decided to get ready for work; she was already wearing her jeans and O'Reilly shirt. A.H. went to the kitchen to apply her make-up. Hemming came into the kitchen and spoke with her, then went back to the bedroom. By the time Hemming again returned to the kitchen, A.H. had packed a lunch and was ready to leave. Hemming told A.H. that Adams was asleep. A.H. responded that she had to go.

{¶ 9} A.H. testified that she was by the front door when Hemming asked her if she

had been crying and wanted a hug. A.H. testified that she had argued with Osborne that morning and was upset, but had not been crying. A.H. replied to Hemming that she was okay, did not want a hug, and needed to leave. Hemming hugged her anyway. A.H. tried to back away, but Hemming grabbed her face and kissed her. A.H. then backed away and again said she needed to leave. Hemming asked her if they could talk first and to not cause a scene. A.H. agreed, and they went to the kitchen.

{¶ 10} A.H. put her lunch and other items on the stove and placed her hands in her front pockets. Hemming grabbed A.H.'s hands from her pockets and told her that he did not understand why she was with Osborne, that she should leave him, and that she could have anyone she wanted. A.H. pulled her hands away and put her hands back in her pockets. A.H. again told Hemming that she needed to leave and went to the stove to retrieve her belongings.

{¶ 11} As A.H. was facing the stove, Hemming came up behind her and pushed her against the stove with his body. He then grabbed A.H.'s left breast with his left hand and put his right hand into A.H.'s pants between her jeans and her underwear. A.H. grabbed his hands and removed them. Hemming then turned A.H. around, exposed his erect penis to her, and forced her to touch it. A.H. repeated that she needed to go. She grabbed her items and went to the door. As she put her hand on the door handle, Hemming grabbed A.H. by the shoulder and asked her not to tell anyone.

{¶ 12} A.H. ran to her car, began to cry, immediately called Osborne, and drove to O'Reilly's. She met Osborne outside of the store and told him what had happened. Osborne left A.H. at the store with their co-worker, whom they trusted, and he returned to the trailer to confront Hemming and to remove his and A.H.'s belongings from the trailer.

A.H. stayed at the store and worked her shift. A.H. and Osborne slept at the co-worker's apartment that night.

{¶ 13} After speaking with Osborne and Adams, A.H. decided to report Hemming's actions to the police. On August 15, the day after the incident, A.H. and Adams drove to the police station, where A.H. gave oral and written statements to Officer Kenneth Webster in the station's parking lot. Officer Webster stated that A.H. was "tearful" and "highly emotional" as she spoke with him. Officer Webster asked A.H. if there might be DNA evidence, and A.H. indicated that she was wearing the same clothing as the day before. After speaking with A.H., Officer Webster and another officer went to the trailer and made contact with Hemming. Hemming answered the officers' questions.

{¶ 14} On August 16, Detective Sara VonHolle of the Special Victims Unit was assigned to the case. VonHolle reviewed Webster's report, contacted A.H., and "ordered" A.H. to come to the downtown Dayton police station at 9:00 a.m. A.H. appeared as instructed and gave a more detailed statement of the incident. Vonholle testified that A.H. was soft-spoken and cried throughout most of the interview. A.H. provided the underwear and clothing that she had been wearing on August 14 to the detective.

{¶ 15} After speaking with A.H., Detective VonHolle and another detective went to Hemming's residence. Hemming came out of the trailer and put his hands behind his back. The detectives placed him under arrest, and Detective VonHolle called for a patrol car to transport Hemming to the downtown police station. At the station, Detective VonHolle informed Hemming of his *Miranda* rights. Hemming stated that he wanted a lawyer, so the detective did not ask him any questions. Hemming then was taken to the

jail.

{¶ 16} On August 18, 2019, Hemming was charged by complaint in the Dayton Municipal Court with sexual imposition with a prior conviction.

{¶ 17} The matter proceeded to a jury trial on February 13, 2020, during which the State presented the testimony of A.H., Osborne, Officer Webster, and Detective VonHolle.   The parties stipulated that Hemming previously had been convicted of gross sexual imposition, in violation of R.C. 2907.05, in *State v. Hemming*, Montgomery C.P. No. 2002-CR-2958.   Hemming called Adams to testify on his behalf.

{¶ 18} After deliberating, the jury found Hemming guilty of sexual imposition, in violation of R.C. 2907.06(A)(1), with a prior conviction.   (Pursuant to R.C. 2907.06(C), Hemming's prior gross sexual imposition conviction elevated the alleged sexual imposition from a third-degree misdemeanor to a first-degree misdemeanor.)   The trial court sentenced Hemming to 180 days in jail, with 30 days suspended and credit for 12 days already served.   The court also imposed a $200 fine, all of which was suspended, plus court costs, and it ordered Hemming to complete two years of community control. The court designated Hemming a Tier I sex offender.

{¶ 19} Hemming appeals from his conviction, raising four assignments of error. We will address them in an order that facilitates our analysis.

## II. Manifest Weight of the Evidence

{¶ 20} In his fourth assignment of error, Hemming claims that his conviction was against the manifest weight of the evidence.

{¶ 21} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more

believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact "clearly lost its way and created such a manifest miscarriage of justice" that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 22} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 23} R.C. 2907.06(A)(1) provides: "(A) No person shall have sexual contact with another, not the spouse of the offender; [or] cause another, not the spouse of the offender, to have sexual contact with the offender * * * when any of the following applies: (1) The offender knows that the sexual contact is offensive to the other person * * * or is reckless in that regard." "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the

person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 24} A person acts "knowingly" when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A person acts recklessly when, with heedless indifference to the consequences, he disregards a substantial and unjustifiable risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C).

{¶ 25} Here, the State's evidence established that Hemming committed sexual imposition. A.H. testified that Hemming hugged and kissed her after she told him that she did not want a hug and needed to leave. Shortly after that, when A.H. was facing the stove to grab her lunch, Hemming pressed himself against her, fondled her left breast, and touched her pubic area with his right hand between her jeans and underwear. A.H. further testified that, when she turned around, Hemming exposed his erect penis and forced her to touch it. Defense counsel elicited testimony that A.H. did not report to Officer Webster that Hemming had forced her to touch his erect penis, but there was no evidence that A.H.'s statements to the police otherwise varied from her trial testimony.

{¶ 26} A.H.'s testimony further established that she told Hemming to stop, that she repeatedly said that she needed to leave, and that she did nothing to encourage Hemming's behavior, either before or during the incident. A.H. testified that she was offended by Hemming's actions, and she thought she did enough to make that clear to him. A.H., Osborne, Webster, and VonHolle's testimony indicated that A.H. was upset and cried, both immediately after the incident and in the days that followed when relating what occurred.

{¶ 27} Hemming's defense counsel challenged A.H.'s credibility through cross-examination of the State's witnesses and testimony from Adams. Adams testified that she had known Hemming for eight years, and they had lived together for seven years. Adams first met A.H. in May 2019, after A.H. left the Army. Adams described her relationship with A.H. as "okay." She had the impression that A.H. sought her (Adams's) approval, and Adams stated that she tried to accept A.H. as her own and to help A.H. feel comfortable.

{¶ 28} Adams testified that she offered to let Osborne and A.H. live with her and Hemming when the arrangement with Osborne's brother was not working. She thought A.H. and Osborne would stay until they got their own trailer, which she thought would take a couple of weeks. However, when the alleged incident occurred on August 14, A.H. and Osborne had been living with Adams and Hemming for at least two months.

{¶ 29} Adams testified that it was taxing on Hemming and her to have Osborne and A.H. in the trailer for two months. She explained that Osborne and A.H. were not paying rent, were taking up space, and were "very slobbish" around the futon; there was a lot of trash and dirty dishes. Adams noted that Osborne was not trying to fix up the trailer next door. Adams also stated that the trailer was small with only one bedroom; she testified that the bedroom did not have a door and that she was an "extremely light sleeper." Adams testified that talking could be heard throughout the trailer.

{¶ 30} Adams indicated that the four of them played a lot of board games together. She testified about an incident in July 2019, when they were playing Taboo with a neighbor. During the game, A.H. made a comment that made Adams uncomfortable. (The trial court sustained objections to the specific comment.) Adams stated that the

comment was directed at the group and was not said in the context of the game.

{¶ 31} Regarding the events of August 14, Adams testified that she was in bed, trying to nap, when Hemming came home upset about going to court on the wrong day. She tried to calm him down, and after about ten minutes, he went to the kitchen for something to eat. Adams played on her phone in bed. She heard the microwave open and close, and she knew that A.H. was in the kitchen, but Adams could not "catch any words." Adams testified that she would have heard if someone had said, in a normal voice, "Get off of me" or "What are you doing." She also said that she would have gotten up and gone to see what was going on if she had heard any type of disagreement.

{¶ 32} Adams stated that she spoke with A.H. on August 15 about what allegedly had occurred with Hemming. Adams testified that her heart broke, but she did not know if the incident actually happened. Adams offered to take A.H. to file a police report, but left the decision to A.H.; Adams testified that she did not necessarily believe A.H.

{¶ 33} On the evening of August 15, Adams drove Hemming's brother home to Columbus with A.H. and Osborne in the car. On the way, she told Hemming's brother what was going on. During that conversation, A.H. did not say anything and did not cry. There was no conversation on the way home.

{¶ 34} We recognize that defense counsel presented testimony from which the jury could have reasonably questioned A.H.'s credibility. During cross-examination of A.H., defense counsel emphasized that A.H. did not include in her oral and written police report that Hemming had forced her to touch his erection. At trial, A.H. sometimes could not recall her specific statements to the police. Defense counsel also questioned A.H. about sexual comments that she made in the presence of Adams and Hemming, perhaps

suggesting that Hemming's sexual advances were not as unwelcome as A.H. testified.

{¶ 35} Counsel further elicited testimony that Adams would have heard the incident had it occurred, but did not. Adams and A.H. both testified that the trailer was small, that the residents had no privacy, and that voices traveled easily throughout the trailer. Adams further testified that she was in the bedroom, that she did not think she had dozed off, and that she did not hear any type of conversation or disagreement on the morning of August 14.

{¶ 36} Finally, defense counsel elicited testimony suggesting that A.H. had fabricated the allegations so that she and Osborne would move out of the trailer they shared with Hemming and Adams. A.H. testified that she and Osborne had been "couch surfing" since March 2019, and that A.H. and Osborne had planned to stay with Adams and Hemming for only a short period while they worked on their trailer. Adams stated that Osborne had not been working on the trailer next door. However, once A.H. informed Osborne about the incident, Osborne removed their belongings from Adams and Hemming's trailer, and the two moved into the trailer next door. A.H. indicated that they stayed at the trailer park, i.e., near to Hemming, because they could not afford to live elsewhere on their income. Defense counsel elicited testimony from Osborne, however, that he also began receiving a medical disability pension in May 2019; in August 2019, that payment was $1,740.

{¶ 37} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. It was the province of the jury, as the trier of fact, to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Hemming had

committed the charged offense. Although there was evidence from which the jury could have reached a different verdict, we cannot conclude that the jury lost its way when it apparently credited A.H.'s version of events and found Hemming guilty of sexual imposition as a first-degree misdemeanor.

{¶ 38} Hemming's fourth assignment of error is overruled.

### III. Limitations on Presentation of Evidence

{¶ 39} In his first assignment of error, Hemming claims that the trial court denied him "the right to fair trial by unreasonably limiting his presentation of evidence." Specifically, he claims that the trial court erred in precluding him from questioning A.H. about issues related to her memory and traumatic brain injury and about statements she allegedly made concerning Club 440, a swinger's club.

*A. Cross-examination regarding A.H.'s memory*

{¶ 40} Pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution, a defendant has a constitutional right to cross-examine the State's witnesses. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993); *State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, ¶ 39, citing *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). That right includes the right to impeach a witness's credibility. *Green* at 147.

{¶ 41} The "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Id*., quoting *Alford v. United States*, 282 U.S. 687, 691, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931). In general, a trial court abuses its discretion "when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966,

986 N.E.2d 971, ¶ 34. However, if the trial court committed a legal error in its ruling, "that ruling necessarily constitutes an abuse of discretion, since the trial court had no discretion to commit a legal error." *State v. Pierce,* 2011-Ohio-4873, 968 N.E.2d 1019, ¶ 72 (2d Dist.).

{¶ 42} Evid.R. 616 addresses methods of impeachment. Of import, Evid.R. 616(B) provides: "A defect of capacity, ability, or opportunity to observe, remember, or relate may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." "In appropriate cases psychiatric testimony can be used to impeach a witness whose ability to perceive, remember, or relate events is allegedly impaired by organic illness or a psychiatric disorder." *State v. Bickerstaff*, 11th Dist. Ashtabula No. 2014-A-0054, 2015-Ohio-4014, ¶ 25, quoting *State v. Wilson*, 8 Ohio App.3d 216, 221, 456 N.E.2d 1287 (8th Dist.1982) (addressing expert testimony); *State v. Sayre*, 3d Dist. Marion No. 9-12-25, 2013-Ohio-4108, ¶ 10.

{¶ 43} When psychiatric or psychological conditions are at issue, Ohio courts have required the questioner to establish a nexus between the specific condition or treatment and the witness's credibility. In *Bickerstaff*, defense counsel sought to cross-examine a minor rape victim's mother about the child's history of psychological diagnosis and treatment. The mother testified that the child had seen a counselor both before and after the incidents. When defense counsel sought to delve into the matter further, the prosecutor objected, and the trial court sustained the objection. Defense counsel then proffered that the answers would have included "a series of counseling and psychiatric conditions that preceded [the time of the rape]." *Id.* at ¶ 24.

{¶ 44} The Eleventh District affirmed the trial court's ruling. The appellate court

reasoned, in part, that the proffer failed to "specifically identify the nature of the psychiatric treatment, any purported diagnosed disorder, and the effects such disorder would have on [the child's] veracity." *Id.* at ¶ 26. The court continued: "If these specifics were before the trial court, it would have been in a position to conduct an in camera inspection of the proffered material and weigh the prejudicial value versus the probative value of the evidence. Without these specifics, the trial court did not err in excluding this line of questioning." *Id.; see also State v. Sayre*, 3d Dist. Marion No. 9-12-25, 2013-Ohio-4108, ¶ 11 (the trial court did not abuse its discretion in sustaining an objection to a question asking whether a witness was under psychiatric care at time of trial; the proffer did not indicate how being under a psychiatrist's care affected the witness's ability to observe and testify to what she observed).

{¶ 45} The Eleventh District previously had reached a similar result in *Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, which Hemming cites. There, defense counsel was permitted to ask an eyewitness whether she was under psychiatric care and whether the medications she took affected her ability to perceive the events at issue, but the trial court sustained objections to questions asking about the specific condition for which the witness was taking medication. The Eleventh District held that the trial court did not abuse its discretion in limiting cross-examination about the specific condition when, prior to trial, the prosecutor disclosed that the witness was receiving treatment for anxiety and depression and the trial court was satisfied that the mental health condition did not affect the witness's ability to perceive and relate events.

{¶ 46} Hemming also cites *State v. Deaton*, 2d Dist. Montgomery No. 24838, 2012-Ohio-3496, in which we addressed the interplay of Evid.R. 616(B) and Evid.R. 607(B).

Evid.R. 607(B) requires a questioner to have "a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." In *Deaton*, the trial court sustained the prosecutor's objections to defense counsel's questions asking whether the witness had taken any prescription medication during the prior 48 hours and whether, at the time of the incident, the witness was on any medication that might have affected her "memory or perception of things going on." Deaton was allowed to inquire whether "there was anything" that would alter the witness's perception of what was taking place in the courtroom during her testimony, to which she responded "no." Of relevance to Hemming's appeal, we held that defense counsel's questions were permissible under Evid.R. 616(B). *Deaton* at ¶ 21. The primary focus of our analysis was whether defense counsel's questions were otherwise precluded by Evid.R. 607(B); upon review of the form of defense counsel's questions, we concluded they were not. *Id.* at ¶ 27.

{¶ 47} Here, defense counsel cross-examined A.H. about discrepancies between her February 2020 trial testimony regarding the August 14 incident and her oral and written statements to Officer Webster on August 15. During defense counsel's questioning, A.H. testified that she told Officer Webster "everything" and also gave a written statement. A.H. agreed that her memory of the events would have been better on August 15, the day after the incident, than on the day of trial. After refreshing A.H.'s recollection with her written statement, A.H. acknowledged that her written statement did not mention that Hemming had turned her around and tried to force her to touch his erection. A.H. agreed that her written statement said, "As I was leaving he showed himself to me." (Trial Tr. 82.)

{¶ 48} Later during cross-examination, defense counsel and A.H. had the following

exchange:

Q: You have trouble sometimes perceiving what the reality of things sometimes, right?

THE STATE: Objection

THE COURT: Sustained

Q: What you testified what happened today is not what you told the police what happened when you talked to them on August 15th and then when you talked to them again on August 16th, correct?  Those have been two different versions of events?

A: They are not two different.  What I wrote on paper is a little different than what I said, yes.

Q: And then you actually even had an interview where you didn't have to write things on paper with Detective Von[H]olle, correct?

A: Yeah.

Q: And that's one where you could have talked and you didn't have to worry about writing things out, correct?

A: Yes.

Q: And even through that opportunity you still not say that Mr. Hemming tried to force his [sic] hand on his erection, correct?

A: I don't remember.

Q: If you heard a recording of what you said would you still not be able to remember?

THE STATE: Your Honor I'm going to object.  Can we side bar on this one

please?

* * *

[Side bar discussion not transcribed]

Q: *A couple of questions I've asked it seemed like you have had some trouble remembering some details of what is said previously and how it goes with what you said today. Would you say that you have some like memory issues that maybe deal with some mental health issues that you may have?*

A: *I have traumatic brain injuries.*

THE STATE: *Objection*

THE COURT: *Sustained – motion to strike the answer that you heard.*

(Emphasis added.) (Trial Tr. 87-88.)

**{¶ 49}** After A.H.'s testimony concluded, defense counsel told the trial court that he wanted to proffer "questions and responses" had he been allowed to ask A.H. "about her original [sic] state." Defense counsel said that he anticipated that, after he asked A.H. about "troubles with memory due to mental state," A.H. would have testified that she had a traumatic brain injury and depression. Defense counsel further stated that he would have asked A.H. about any treatment or medication that she was taking for those conditions and, depending on her answer, about how those treatments or medications, or lack thereof, affected her memory on August 14 and at trial.

**{¶ 50}** On appeal, Hemming claims that the trial court improperly prohibited the admission of the proffered testimony. Hemming argues that evidence regarding A.H.'s traumatic brain injury and medication was relevant to an evaluation of her credibility and admissible under Ohio's evidentiary rules.

{¶ 51} We agree with Hemming's general proposition that A.H.'s ability to correctly perceive, recall, and relate the events of August 14 was relevant to a determination of her credibility and, correspondingly, of Hemming's guilt. *See* Evid.R. 402. We focus, however, on whether the trial court abused its discretion in disallowing defense counsel's specific question.

{¶ 52} Hemming argues that Ohio case law permits questions relating to whether the witness was under psychiatric care, whether the witness was taking medication, and whether the medication affected the witness's ability to perceive the events to which he or she testified. While we might agree with this assertion, defense counsel did not ask A.H. these questions, and the record does not support that the trial court precluded defense counsel from doing so.

{¶ 53} The focus of Hemming's assignment of error is his question to A.H., asking "Would you say that you have some like memory issues that maybe deal with some mental health issues that you may have?" The phrasing of the question was somewhat inartful, and A.H. could have reasonably been confused whether defense counsel was asking for a yes or no as to whether she had memory issues or whether defense counsel was asking if she had a mental health condition. A.H. responded that she had traumatic brain injuries. Given that answer, the trial court could have reasonably concluded that the question elicited information about A.H.'s mental health diagnosis without a foundation that she had a condition that did, in fact, impair her memory of events or her ability to perceive the events. The trial court's ruling did not preclude defense counsel from asking A.H. whether she was taking any medication that would affect her ability to perceive, recall, or relate events that had occurred, nor did it restrict defense counsel from

simply asking if she had difficulties with her memory.

{¶ 54} In his appellate brief, Hemming cites to several cases that have recognized that traumatic brain injuries may manifest themselves by "significant memory loss, a general distrust of other people, cognitive defects, difficulty focusing, and severe maladaptive behaviors." However, defense counsel did not directly ask A.H. if she had memory loss, and defense counsel did not proffer that A.H.'s traumatic brain injury had that symptom. The trial court reasonably sustained the State's objection to defense counsel's question, as phrased, in the absence of evidence that *A.H.'s* traumatic brain injury affected her ability to perceive or remember the alleged sexual imposition.

{¶ 55} We further note that, just prior to the cross-examination question at issue, the parties had a sidebar discussion following defense counsel's question as to whether A.H. would be able to remember what she said in her interview with the detective even if a recording of the interview were played for her. The sidebar discussion was not transcribed, and we have no way of knowing the extent of the discussion regarding A.H.'s memory or the trial court's ruling, if any, following that discussion.

{¶ 56} Under the facts before us, the trial court did not abuse its discretion in sustaining the State's objection.

*B. Questions regarding Club 440*

{¶ 57} Hemming further claims that the trial court erred in excluding testimony from Adams about A.H.'s statements regarding Club 440. Hemming argues that the testimony was admissible as a prior inconsistent statement under Evid.R. 801(D)(1).

{¶ 58} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion.

*State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. Again, a trial court abuses its discretion "when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 59} Under Evid.R. 801(C), "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801 also identifies certain statements that are not hearsay. Specifically, Evid.R. 801(D)(1) provides:

A statement is not hearsay if:

(1) Prior Statement by Witness. The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is (a) inconsistent with declarant's testimony, and was given under oath subject to examination by the party against whom the statement is offered and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification.

*See also State v. Schooler*, 2d Dist. Montgomery No. 28596, 2020-Ohio-4327, ¶ 12 (victim's alleged statements at the scene would not qualify as non-hearsay under Evid.R. 801(D)(1) because they were not made under oath).

{¶ 60} Defense counsel cross-examined A.H. about sexually explicit comments

that she allegedly had made.  A.H. testified that "we all" made sexually explicit comments while playing certain board games, such as Taboo and Cards Against Humanity.  A.H. agreed that, during a game of Taboo, she made a comment about having sex with Osborne in the bathroom while others were in the home.  A.H. acknowledged that she had made other sexually explicit comments, but she disagreed that she would "jump around with Byron [Hemming] and Anita [Adams] with some sexually explicit comments." (Trial Tr. 78.)  The State objected to this last question and requested a sidebar discussion.  The sidebar discussion was not transcribed.

{¶ 61} After the sidebar discussion concluded, defense counsel next asked A.H.:

Q: In July 2019, shortly after you moved in, you joked around with Byron and Anita that you should all go to Club 440 together, correct?

A: It was their idea.

Q: But you said we should all go to Club 400 together, correct?

A: I did not say that.

Q: So if Sebastian and Byron and Anita all testified that you said it then all three of them would by lieing [sic]?

A: I did not say that.

Q: I asked you if Sebastian and Byron and Anita all state that they heard you say it several times all three of them would be lieing [sic]?

A: Yes.

(Trial Tr. 78-79.)

{¶ 62} During defense counsel's direct examination of Adams, defense counsel sought to elicit testimony about A.H.'s alleged sexually explicit comments.  Adams

recalled playing Taboo with A.H., her son, and Hemming in July 2019, and that A.H. made a comment that made Adams feel uncomfortable. When defense counsel asked Adams to repeat A.H.'s specific comment, the prosecutor objected on hearsay grounds. The trial court sustained the objection. When defense counsel asked why the comment made Adams feel uncomfortable, Adams responded, "Ugh it was sexually implicit." The prosecutor renewed her objection, and the objection was sustained. (Trial Tr. 144.)

{¶ 63} Defense counsel then asked Adams if she felt comfortable or uncomfortable when A.H. and Osborne first moved in. Adams answered, "I tried to feel comfortable. She was – [A.H.] was harping on the fact that we would – we should all go to Four Forty – Club Four Forty." (Trial Tr. 145.) The prosecutor again objected on hearsay grounds, and the court sustained the objection.

{¶ 64} Defense counsel sought to present testimony from Adams that A.H., the declarant, suggested that the four go together to Club 440; A.H.'s alleged statement was being offered for the truth of the matter asserted, i.e., that A.H. made such a suggestion. On its face, A.H.'s alleged statement constituted hearsay.

{¶ 65} A.H.'s alleged statement regarding Club 440 does not meet the definition of a prior inconsistent statement under Evid.R. 801(D)(1), because it was not made under oath and subject to cross-examination. Accordingly, the trial court properly sustained the State's objection and excluded Adams's testimony regarding A.H.'s alleged statement as inadmissible hearsay.

{¶ 66} Hemming's first assignment of error is overruled.

### IV. Prosecutorial Misconduct

{¶ 67} In his second assignment of error, Hemming claims that the prosecutor

engaged in multiple acts of misconduct that deprived him of a fair trial.

{¶ 68} The test for prosecutorial misconduct is whether the prosecutor's remarks or actions were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Carr*, 2d Dist. Montgomery No. 27960, 2020-Ohio-1523, ¶ 60, citing *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 69} "In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial," and if "it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed." *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. *See also State v. Hall*, 2d Dist. Montgomery No. 25794, 2014-Ohio-2094, ¶ 19.

*A. Post-Arrest Silence*

{¶ 70} First, Hemming argues that the prosecutor improperly elicited testimony concerning Hemming's post-arrest silence when she asked Detective VonHolle whether Hemming invoked his right to an attorney after his arrest. (Trial Tr. 132, 136.) Hemming argues that the detective's testimony was offered as a "confession by silence" and as substantive evidence of his guilt. The State responds that the exchange about Hemming's invocation of his right to an attorney was presented to describe the course of the investigation and that the detective's testimony was not used as substantive evidence of Hemming's guilt.

{¶ 71} Defense counsel did not object to the prosecutor's questions, nor did he ask the trial court for a curative instruction. We therefore review the prosecutor's conduct for plain error. *See, e.g., State v. Smith*, 2d Dist. Montgomery No. 28265, 2019-Ohio-5015, ¶ 50 ("Failure to object to prosecutorial misconduct at trial waives all but plain error."). Plain error exists when, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 29, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 72} It is well established that the assertion of the right to counsel may not be used against an accused. *E.g., State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 91; *State v. Combs*, 62 Ohio St.3d 278, 281, 581 N.E.2d 1071 (1991); *see also Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (the defendant's invocation of the right to remain silent upon arrest, after *Miranda* warnings, could not be used to impeach the defendant's testimony at trial). The Ohio Supreme Court has expressly held that "the use of a defendant's post-arrest, post-*Miranda* invocation of his right to counsel as substantive evidence of guilt violates the Fourteenth Amendment." *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 1. *Accord Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (use of post-arrest, post-*Miranda* silence as substantive evidence in the state's case-in-chief violated due process).

{¶ 73} In *Leach*, the Ohio Supreme Court further rejected the State's contention that evidence of the defendant's pre-arrest, pre-*Miranda* silence, evidenced through a statement that he wanted to speak with his attorney before speaking with police, was appropriately introduced in the State's case-in-chief as evidence of the "course of the investigation." *Leach* at ¶ 32. The supreme court reasoned that testimony regarding Leach's decision to speak first with his attorney was not a statement explaining the course of the investigation, was not material to Leach's guilt or innocence, and was offered for an inference that innocent people speak with the police whereas guilty people ask to speak with their attorneys. *Id.*; *see also State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 155-162 (the prosecutor's comments during closing argument about defendant's pre-arrest refusal to talk with the detective were improper but harmless).

{¶ 74} The State asserts that Detective VonHolle's testimony that Hemming's invocation of his right to an attorney was not extensive and was offered to explain the course of her investigation. The State cites to *State v. Rosa*, 8th Dist. Cuyahoga No. 108051, 2019-Ohio-4888, which found no error in the admission of the detective's testimony that she had tried to speak with the defendant after executing a search warrant at his home, but he did not want to give a statement or talk to her. The Eighth District stated that the defendant's testimony was not offered as substantive evidence of his guilt, but was a single comment mentioned in describing the course of the detective's investigation. *Id.* at ¶ 40.

{¶ 75} We disagree with the State's and *Rosa*'s conclusion that *Leach* and *Doyle* permit a law enforcement officer to testify on a defendant's decision not to speak with the

police or to seek the advice of counsel while explaining the course of the officer's investigation. *Leach* directly addressed this issue and held otherwise. Accordingly, we conclude that the prosecutor should not have elicited testimony from Detective VonHolle that Hemming requested an attorney after receiving *Miranda* warnings.

{¶ 76} We nevertheless cannot conclude that this error rises to the level of plain error. Hemming had two separate contacts with the police following A.H.'s allegations. After A.H. gave her statements to Officer Webster, Webster and another officer went to speak with Hemming at his residence. Webster testified on cross-examination that Hemming did not invoke his right to remain silent or ask to speak with attorney; rather, Hemming answered the officers' questions and was "forthcoming." In addition, Detective VonHolle testified that she asked Hemming if he would provide a DNA sample and he did so voluntarily. Hemming's interactions with the police, viewed as a whole, negated an inference that he invoked his right to an attorney following his arrest because he was guilty.

{¶ 77} In addition, the State did not otherwise comment on Hemming's invocation of his right to an attorney. The prosecutor did not mention Hemming's interactions with the police during closing argument. In contrast, defense counsel's closing argument highlighted that Hemming spoke with Officer Webster because he did not have "anything to hide" and that Hemming willingly provided a DNA sample to clear himself. Defense counsel noted that, both times, Hemming did not ask for a lawyer. On this record, we cannot conclude that the prosecutor's eliciting of testimony that Hemming requested a lawyer prior to speaking with the detective affected the outcome of the trial.

*B. Leading Questions*

{¶ 78} Second, Hemming claims that the prosecutor deprived him of a fair trial by improperly using leading questions with A.H. "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " (Citation omitted) *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149. We have recognized that a question calling for a "yes" or "no" answer but not suggesting the answer is not leading. *State v. Moore*, 2019-Ohio-1671, 135 N.E.3d 1114, ¶ 52 (2d Dist.); *State v. Taylor*, 2d Dist. Montgomery No. 20944, 2006-Ohio-843, ¶ 47, ¶ 56.

{¶ 79} Hemming references four parts of the trial transcript as examples of leading questions. In the first exchange, the prosecutor questioned A.H. about what occurred when Hemming left the bedroom on the morning of August 14:

Q: What happens when he [Hemming] comes out of that bedroom and comes into different parts of the trailer?

A: He was only wearing his pants. He was shirtless and I remember him asking about his ties and which one he should wear when he went to court the next day. I told him I don't remember which one it was looked better because it actually matched what he was wearing.

* * *

[Court asks A.H. to speak louder.]

Q: So let's kind of go back. He is now leaving the bedroom. He comes out and it was your testimony that he is only no pants and just shirt?

A: Yes ma'am.

(Trial Tr. 48-49.)

{¶ 80} Hemming argues on appeal that the prosecutor's second question was not

only misleading, but also misstated A.H.'s testimony. We agree with Hemming that the second question was leading and that it misstated A.H.'s prior testimony about what Hemming was wearing. However, defense counsel did not object to the prosecutor's question or A.H.'s answer, and viewing the evidence as a whole, we cannot conclude that this exchange deprived Hemming of a fair trial.

{¶ 81} Hemming also cites to three other series of questions and answers during A.H.'s direct examination, as follows.

Q: Is that correct? What happens after that?

A: When I had turned around and he had turned me around is when he had pulled down his gym shorts and was showing me his genitalia.

Q: Did he have underwear on?

A: No, not that I was aware of.

Q: OK, and I guess was his genitalia erect?

A: It was.

(Trial Tr. 60-61.) The prosecutor later asked additional questions about Officer Webster:

Q: So let's back track a little bit. You talked to Officer Webster? Is that correct?

A: Yes.

Q: And then were you crying when you were trying to tell him what happened? Was it hard for you to gain your composure to actually get out what happened?

A: Yes.

Q: Would you say that you were hysterical?

A: Yeah.

(Trial Tr. 68.)

Q: And what happened during that conversation [with Detective VonHolle]?

A: I was telling her everything that happened and . . .

Q: Were you crying?

A: Yes.

Q: Are you still upset?

A: Yes.

Q: So did this situation, I guess, just bother you emotionally?

A: Yes.

Q: Was it hard for you again to gain your composure to tell her what happened?

A: Yes, because it's somebody I didn't know.

(Trial Tr. 68.)

{¶ 82} Other than the prosecutor's prefatory question indicating that he was about to question A.H. again about her conversation with Officer Webster, none of the prosecutor's questions in these three examples constitute leading questions. Here, the prosecutor's questions to A.H. called for a "yes" or "no" answer, but they neither suggested which answer the prosecutor desired nor embed an answer in the question. Accordingly, the prosecutor's additional questions were not improper. Even if the questions about A.H.'s emotional state were leading, Officer Webster and Detective VonHolle both testified that A.H. was upset and crying during their interviews with her. We cannot conclude that the prosecutor's use of alleged leading questions denied

Hemming a fair trial.

### C. Use of Chart During Closing Argument

{¶ 83} Third, Hemming argues that the prosecutor improperly used a "chart" during closing argument. The chart is not in the record, but the record reflects that the prosecutor used a checklist with the elements that the State had to prove. Hemming argues that the State's use of the visual aid usurped the role of the jury and invited the jury to convict him based on the chart. Hemming did not object to the prosecutor's closing argument or her use of a visual aid. Accordingly, he has waived all but plain error.

{¶ 84} In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 306; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

{¶ 85} The prosecutor began her closing argument by stating that the date, location, and alleged perpetrator of the offense were shown and not in dispute, and the prosecutor checked those boxes on her checklist. The prosecutor then discussed the elements of sexual imposition and described the evidence at the trial in support of each element. At the conclusion of her closing argument, the prosecutor had checked all of the boxes on the visual aid, and she argued that the State had established each element beyond a reasonable doubt. The prosecutor told that jury that it should find Hemming guilty of sexual imposition.

{¶ 86} We find no misconduct in the prosecutor's use of the "chart" during her

closing argument. In this case, the transcript indicates that the prosecutor used the checklist to identify the elements that the State was required to prove, and the prosecutor simply checked those elements as she argued the State had met its burden on each of those elements. The prosecutor did not invite the jury to convict Hemming based on evidence not presented at trial. In short, the prosecutor's actions did not exceed the latitude afforded a prosecutor during closing argument.

{¶ 87} We further note that the trial court instructed the jury that closing statements of counsel were not evidence and were not to be considered in reaching its verdict. We presume that the jury followed this instruction. Hemming's second assignment of error is overruled.

## V. Ineffective Assistance of Counsel

{¶ 88} In his third assignment of error, Hemming claims that he received ineffective assistance of counsel. He asserts that his trial counsel should have objected to the prosecutor's questions to Detective VonHolle regarding his post-arrest silence, the prosecutor's asking of leading questions during direct examination, and the prosecutor's use of a visual aid during closing argument.

{¶ 89} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Bradley, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's

perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 90} The prosecutor should not have questioned Detective VonHolle about Hemming's invocation of his right to an attorney following his arrest. In addition, the prosecutor mischaracterized A.H.'s testimony when it asked her, in a leading manner, whether Hemming was wearing no pants and just a shirt upon exiting his bedroom. On the record before us, however, we cannot conclude that the outcome of Hemming's trial would have been different had defense counsel objected to the State's questions. As to Hemming's other allegations, the State generally did not ask improper leading questions and the prosecutor did not improperly use a visual aid during closing argument. Accordingly, defense counsel did not act deficiently when she failed to object to those actions.

{¶ 91} Hemming's third assignment of error is overruled.

## VI. Conclusion

{¶ 92} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Lindsay E. Bozanich
Andrew Sexton
Anthony VanNoy
Hon. Carl S. Henderson